[Civ. No. 22468. Third Dist. June 8, 1984.]

NEIGHBORHOOD ACTION GROUP FOR THE FIFTH DISTRICT et al., Plaintiffs and Appellants, v.
COUNTY OF CALAVERAS et al., Defendants and Respondents;
TEICHERT CONSTRUCTION COMPANY,
Real Party in Interest and Respondent.

## COUNSEL

Berliner & Spiller, Clarence H. McProud and David M. Walters for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, Joel S. Moskowitz and Mark Urban, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

Jeffrey Tuttle, County Counsel, for Defendants and Respondents.

McDonough, Holland & Allen and William L. Owen for Real Party in Interest and Respondent.

## OPINION

**BLEASE, J.**—In this case we decide that the issuance of a conditional use permit is ultra vires if the general plan of the issuing entity (see Gov. Code, § 65300 et seq.)[1] does not conform to mandatory statutory criteria which are relevant to the uses sought by the permit.

---

[1]All statutory references are to the Government Code, unless otherwise noted.

The controversy arises from the transportation of processed detritus from hydraulic gold mining, California's archetypical environmental dispute. Calaveras County granted Teichert Construction Company a conditional use permit to process hydraulic mine tailings for the production of sand and gravel. Plaintiffs seek to invalidate the permit.

The complaint alleges the permit is invalid because the county general plan does not comply with statutory criteria. General demurrers to this claim were sustained without leave to amend. The remaining claims, the adequacy of an environmental impact report (EIR) and the conformity of the use permit with the current general plan, proceeded to trial. The county and Teichert prevailed and judgment was entered. We will conclude it was error to sustain the demurrers and will reverse the judgment.[2]

FACTS

The action we review, in administrative mandamus (Code Civ. Proc., § 1094.5), tenders an issue of pleading on demurrer, uninformed (with one exception) by the administrative record.[3]

We accordingly accept as true the factual allegations of the complaint. (See, e.g. *Glaire* v. *La Lanne-Paris Health Spa., Inc.* (1974) 12 Cal.3d 915, 918 [117 Cal.Rptr. 541, 528 P.2d 357].) It alleges the conditional use permit authorizes Teichert to harvest and process sand and gravel from hydraulic mine tailings near the Calaveras River immediately to the south of the Town of Jenny Lind. The operation is a large one. It is estimated by Teichert that 40 to 80 large tractor-trailer vehicles loaded with sand and gravel will leave the site each day during the peak seasons. A rock crushing plant is to be constructed at the site to reduce the gravel to a useable size. The operation will produce substantial noise, dust and traffic hazards, among other adverse effects.

On October 16, 1980, the Calaveras County Planning Commission approved the conditional use permit and certified its associated final environmental impact report (see Pub. Resources Code, § 21000 et seq.) as com-

---

[2]The appeal also raises contentions the EIR certification is improper for failure to discuss the cumulative impacts of a prior sand and gravel permit and for failure to display in writing a proper balancing of environmental concerns. We do not reach these questions. Our disposition of the contention it was error to sustain the demurrers necessitates remand to the trial court. The outcome of the conformity causes of action may obviate the need for appellate resolution of the other contentions of error. No useful purpose would be served by piecemeal review in this context.

[3]The administrative record was not incorporated in the complaint.

plete. Appellant Madeline Hobson appealed to the county board of supervisors on behalf of herself and Neighborhood Action Group for the Fifth District (Neighborhood), an unincorporated association of taxpayers residing in the vicinity of the project site. Hobson is a taxpayer residing in Jenny Lind. We collectively refer to Neighborhood and Hobson as Neighborhood.

On April 13, 1981, the Neighborhood appeal was heard by the board of supervisors. Neighborhood objected to the permit on the grounds it "could not legally be approved because the noise, seismic safety and safety elements [of the county's general plan] were inadequate and that the proposed project could not therefore be consistent with [it], that there were significant unmitigated adverse environmental impacts, including noise, dust, aesthetics, road hazards caused by the large trucks, and others, and that the EIR was incomplete due to a failure to discuss culmulative [sic] effects of noise, dust and safety as related to the adjacent George Reed sand and gravel plant, a failure to respond to the significant environment [sic] points raised in the consultation and review process, among others, off site noise, safety and esthetics." Nonetheless, the board of supervisors certified the environmental impact report as complete and approved the use permit.

An issue of concern to Neighborhood is the truck route. The route for the sand and gravel trucks is Milton Road or Jenny Lind Road to Highway 26 and thence to Stockton. "A substantial subdivision of residential lots has been approved along Jenny Lind Road and numerous homes have already been or are in the process of construction. Along Milton Road there are a number of homes already constructed and there are a number of subdivision lots which have been approved." The route traverses "narrow rural roads and will utilize several bridges with a road width of approximately nineteen and one-half (19 1/2) feet. School buses pass over these bridges a number of times each day during the school year." Teichert's operation increases road hazards on the route of the sand and gravel trucks.

The complaint claims the noise element of the Calaveras County general plan does not comply with state statutes. It says: a lawful "noise element would have provided [the county] with standards and an analytic framework by which [it] would have been enabled to make a superior decision [on the use permit] taking into account the severe noise impacts of the project . . . ." "The combined safety and seismic safety element of the General Plan of the County of Calaveras contains no description of evacuation routes, peak load water supply requirements, minimum road widths, clearances around structures or any mention of mud slides or slope stability." These shortcomings render the elements out of conformity with governing state statutes.

The complaint was filed on May 13, 1981. It requested: the use permit be vacated; the county adopt a general plan in compliance with statutory criteria; and the county abstain from future land use planning actions until such general plan compliance is achieved.

## DISCUSSION

### I

Neighborhood claims the county's approval of a conditional use permit is ultra vires because the county's general plan was not in compliance with governing statutes.[4] Its premise is that a conditional use permit may not be granted unless the use is consistent with a lawful general plan.[5] The county and Teichert insist a conditional use permit requires no such predicate for its issuance. Alternatively, they argue that any flaw in the general plan has been rendered moot because the California Office of Planning and Research, on August 14, 1981, extended the time for the county to amend its general plan to comply with the challenged statutory criteria. (See Gov. Code, § 65302.6.) We will conclude Neighborhood's legal premise has merit and post hoc absolution is unavailing.

This case tenders two questions: first, does the county have authority to issue a conditional use permit if it has failed to adopt a general plan containing elements, required by state law, which are relevant to the uses authorized by the permit; second, if not, by what remedy may that authority be challenged?

### A.

The Planning and Zoning Law of California (see § 65000 et seq.) establishes the authority of most local government entities to regulate the use of land. (See § 65850; *Topanga Assn. for a Scenic Community* v. *County of Los*

---

[4]Neighborhood informs us in its appellate brief that the challenged general plan elements have been amended during the course of this litigation. We accept this statement as an abandonment of any quest for broader relief than invalidation of Teichert's permit.

[5]Neighborhood's explicit argument is narrower. Apparently it is resigned to the proposition that *Hawkins* v. *County of Marin* (1976) 54 Cal.App.3d 586 [126 Cal.Rptr. 754] (discussed at length, *infra*) forecloses a general requirement of consistency between a conditional use permit and a lawful general plan. It argues for conformity as a requirement which is derivative of a condition imposed by the office of planning and research on extensions of time granted the county to remedy defects in the general plan. (See § 65302.6, discussed in fn. 12, *post.*) The condition requires that, during the extension period: "All . . . use permits may be approved only if the proposed action is consistent with: [¶] a. The policies of the *existing* General Plan . . . ." (Italics added.) As we find *Hawkins* not controlling, we have no occasion to address the arguments of the parties and amicus curiae on this point.

*Angeles* (1974) 11 Cal.3d 506, 518-519, fn. 18 [113 Cal.Rptr. 836, 522 P.2d 12].) It commands the county to adopt "a comprehensive, long-term general plan for the physical development of the county . . . ." (§ 65300.) A general plan is "a statement of development policies and shall include a diagram . . . and text setting forth objectives, principles, standards, and plan proposals." It must include designated elements. (§ 65302.) A seismic safety element and a noise element have been required since January 1, 1971, and a safety element since January 1, 1976. (See Stats. 1971, ch. 1803, p. 3900; Stats. 1975, ch. 1104, p. 2677.)

The general plan is atop the hierarchy of local government law regulating land use. It has been aptly analogized to "a constitution for all future developments." (See *O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774 [42 Cal.Rptr. 283].) The Legislature has endorsed this view in finding that "decisions involving the future growth of the state, most of which are made and will continue to be made at the local level, should be guided by an effective planning process, including the local general plan, and should proceed within the framework of officially approved statewide goals and policies directed to land use, population growth and distribution, development, open space, resource preservation and utilization, air and water quality, and other related physical, social and economic development factors." (§ 65030.1.)

Subordinate to the general plan are zoning laws, which regulate the geographic allocation and allowed uses of land. Zoning laws must conform to the adopted general plan. (§ 65860; *Resource Defense Fund* v. *County of Santa Cruz* (1982) 133 Cal.App.3d 800 [184 Cal.Rptr. 371].) These enactments provide the authority and the criteria for the regulation of land uses. (See §§ 65850, 65851 & 65860; Cal. Zoning Practice (Cont.Ed.Bar 1969) ch. 6.)

Zoning laws regulate land uses in two basic ways. Some uses are permitted as a matter of right if the uses conform to the zoning ordinance. Other sensitive land uses require discretionary administrative approval pursuant to criteria in the zoning ordinance. (§ 65901.) They require a conditional use permit. (See Cal. Zoning Practice, *supra*, § 7.55 et seq.) The reason for discretionary treatment is that these are uses which "cannot be said to be always compatible in some zones while always incompatible in others. . . . uses that should not be allowed as of course, but could be allowed subject to conditions . . . ." (Gaylord, *Zoning: Variances, Exceptions and Conditional User Permits in California* (1958) 5 UCLA L.Rev. 179, 193.) ■ "[T]he traditional purpose of the conditional use permit is to enable a municipality to exercise some measure of control over the extent of certain

uses, such as service stations, which, although desirable in limited numbers, could have a detrimental effect on the community in large numbers." (*Van Sicklen* v. *Browne* (1971) 15 Cal.App.3d 122, 126 [92 Cal.Rptr. 786].)

With this context in mind we consider the first question presented.

### B.

■ Although use permits are not explicitly made subject to a general plan meeting the requirements of state law, that condition is necessarily to be implied from the hierarchical relationship of the land use laws. To view them in order: a use permit is struck from the mold of the zoning law (§ 65901); the zoning law must comply with the adopted general plan (§ 65860); the adopted general plan must conform with state law (§§ 65300, 65302). The validity of the permit process derives from compliance with this hierarchy of planning laws. These laws delimit the authority of the permit issuing agency to act and establish the measure of a valid permit. "Since consistency with the general plan is required, absence of a valid general plan, or valid relevant elements or components thereof, precludes enactment of zoning ordinances, and the like." (*Resource Defense Fund* v. *County of Santa Cruz, supra,* 133 Cal.App.3d at p. 806; see also *Save El Toro Assn.* v. *Days* (1977) 74 Cal.App.3d 64 [141 Cal.Rptr. 282]; *Guardians of Turlock's Integrity* v. *Turlock City Council* (1983) 149 Cal.App.3d 584, 592-593 [197 Cal.Rptr. 303].) This is a specific application of the general rule: "[T]here is no agency discretion to promulgate a regulation which is inconsistent with the governing statute." (See *Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032].)

■ Zoning ordinances are regulations governed by the superior enactments in the hierarchy of planning laws. Thus, the validity of a conditional use permit, which is governed by the zoning regulations, depends (derivatively) on the general plan's conformity with statutory criteria. Where the adopted general plan lacks elements required by state law, relevant to the uses sought, the ordinance fails to provide criteria mandated by such law for the measurement of the propriety of the uses to be authorized by the permit. These criteria are essential to evaluation of the proposed uses and the conditions which should be imposed. Put another way, the scope of authority of the agency to enact a general plan and zoning ordinances and *to apply them* is governed by the requirements of state law. A permit action taken without compliance with the hierarchy of land use laws is ultra vires as to any defect implicated by the uses sought by the permit.

Our view is reinforced by section 65302.6. It provides for extension of the deadline for mandatory compliance of general plans with the require-

ments of section 65302. As a prerequisite to an extension, the local entity seeking an extension must propose "policies and procedures which would ensure, during the extension . . . that the land use proposed in an application for a . . . *land use permit* . . . will be consistent with the existing general plan elements, and on the basis of available information will be consistent with the new elements or plan proposals being considered or studied." (§ 65302.6, subd. (c)(3).) The inference is plain that a conditional use permit must be consistent with a lawful general plan. If the general plan fails to provide required criteria relevant to the use sought by the permit, there is no valid measure by which the permit may be evaluated.

This reasoning is supported by *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514]. It correctly observes that an implicit statutory requirement that land use planning decisions comply with the general plan pervades the Planning and Zoning Law. "The implied statutory requirement of consistency has no less effect than the express statutory subdivision map consistency requirement. . . ." (*Id.,* at p. 998; also see DiMento, *Developing the Consistency Doctrine: The Contribution of The California Courts* (1980) 20 Santa Clara L.Rev. 285 (hereafter *Consistency*).)

The county and Teichert rely on *Hawkins, supra,* to support their claim that conditional use permits need not be consistent with the county general plan. The plaintiffs in *Hawkins* sought to invalidate a conditional use permit approved March 6, 1972, by means of a complaint filed two years after the permit was granted. They invoked a provision in section 65860 which provided then, as now, that zoning ordinances must be consistent with the adopted general plan commencing January 1, 1974. (See Stats. 1973, ch. 120, § 6, p. 184.) The use permit was approved (1972) prior to the effective date of the conformity requirement. (See Stats. 1971, ch. 1446, § 12, p. 2858.) However, in dicta,[6] the court said that "section 65860 is inapplicable to a review of the [conditional use] permit" since it contains "no requirement . . . that such permits themselves be reviewed for consistency with the [general] plan"; it reasoned that "[s]ince use permits issued pur-

---

[6]As applicable to the facts in *Hawkins,* section 65907 imposed a 180-day statute of limitations upon a challenge to a conditional use permit. (See Stats. 1965, ch. 1341, § 5, p. 3228.) For reasons not immediately apparent, the court declined to apply section 65907 as a statute of repose. (It implied that to do so would be unfair because the statutory right to consistency (§ 65860) did not become effective until after the limitation period had elapsed.) (*Id.,* 54 Cal.App.3d at pp. 593-594; but cf. *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 653-657 [150 Cal.Rptr. 242, 586 P.2d 556], subdivision map consistency is measured by law in effect at the time of issuance of the tentative map.) Nonetheless, the court declined to apply section 65860 on the ground that, while it confers standing to challenge a zoning ordinance for lack of conformity, it does not explicitly require conformity of conditional use permits with the general plan.

suant to [the zoning ordinance] must necessarily conform to its requirements, it follows that *if* [the zoning ordinance] is kept consistent with the general plan, use permits issued thereunder will also be consistent therewith." (*Id.,* 54 Cal.App.3d at pp. 594-595, italics added.)

The flaw in the argument is the conditional "if." *If* the general plan is not consistent with state law, the zoning ordinance may fail to provide criteria by which to measure the propriety of the uses sought by the permit. The *Hawkins* reasoning opens the door to defeat of the purpose of a general plan to provide enforceable standards by which the administering agency must measure the propriety of the permits. (See DiMenito, *Consistency, supra,* at pp. 295-298.) We will not join in its dictum.[7]

## C.

This brings us to the question of remedies: by what means may the validity of a conditional use permit be challenged as issued without the criteria of a valid general plan?

We start with the general rule that affected citizens may challenge a permit that has been issued in violation of the law. The granting of a conditional use permit is a quasi-judicial act. (See *Essick* v. *City of Los Angeles* (1950) 34 Cal.2d 614, 623 [213 P.2d 492].) Such an act may be challenged if the respondent has not proceeded in the manner required by law. (See Code Civ. Proc., § 1094.5, subd. (b).) Ordinarily, administrative mandamus "is the proper means for review of an adjudicatory decision . . . which is alleged to be invalid because it is based upon an invalid regulation." (See *Woods* v. *Superior Court, supra,* 28 Cal.3d at pp. 674-675.) However, if a statutory remedy is explicitly provided, the applicability of that remedy must be addressed. We note that *Friends of "B" Street* relies upon the absence of a statutory remedy as a predicate for its implied remedy. (106 Cal.App.3d at p. 999.)

The remedies applicable to the challenge of a zoning ordinance are, in part, specifically addressed by statute. The zoning ordinance is in the chain of authority by which the requirements of state planning law are transformed

---

[7]We have no quarrel with the *Hawkins* result. But the facts here serve to distinguish it. At the time of approval of the conditional use permit in this case, the governing statute required that the zoning ordinance, which provides criteria for a conditional use permit, conform to the adopted general plan. (§ 65860.) The consistency claim was seasonably tendered in the administrative proceedings. (Compare *Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 358-359 [176 Cal.Rptr. 620].) The action was timely filed within the time limitations of section 65907.

by quasi-legislative action into criteria for the issuance of conditional use permits. The legality of a zoning ordinance is thereby impliedly called into question when a permit is challenged on the ground the general plan is not in conformity with state law.　■　Accordingly, our inquiry must encompass the statutory remedies which may apply to such an implied challenge to a zoning ordinance. That brings us to section 65860, subdivision (b).[8] It authorizes a resident or property owner to bring an action "to enforce compliance" with the provisions of section 65860, subdivision (a), which mandates that the zoning ordinance "shall be consistent with [the adopted] general plan."

The announced purpose of this remedy is to compel amendment of the zoning ordinance to comply with the adopted general plan and to provide ancillary remedies while that is being done. (See 58 Ops.Cal.Atty.Gen. 21 (1975).) It follows that this remedy is not applicable, as here, in cases in which the ordinance is in conformity with the "adopted" general plan but the "adopted" plan is out of conformity with state statutes. Nor is it applicable where the action does not, as here, seek amendment of the zoning ordinance but, rather, challenges the validity of a conditional use permit.

There is an additional consideration in this case which supports our reading of section 65860. The inherent likelihood of serious deleterious effects from surface mining is recognized by the provision in a Calaveras ordinance which requires that such an activity be accompanied by a zoning change permitting the use. Teichert's conditional use permit was granted subject to such a zoning change. Neighborhood had no remedy by reason of section 65860 to challenge an ordinance in advance of its enactment.

### D.

This brings us to the question: what defects in the general plan may be raised in a challenge to a conditional use permit?

■　A defect in a general plan element which has no bearing on the criteria applicable to the use permit cannot affect its validity. In that event, there is no issue of criterial sufficiency, i.e., sufficiency of the standards by

---

[8]Section 65860, subdivision (b) provides: "(b) Any resident or property owner within a city or a county, as the case may be, may bring an action in the superior court to enforce compliance with the provisions of subdivision (a). Any such action or proceedings shall be governed by Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure. Any action or proceedings taken pursuant to the provisions of this subdivision shall be taken within 90 days of the enactment of any new zoning ordinance or the amendment of any existing zoning ordinance as to said amendment or amendments."

which issuance of the permit is to be governed, and hence no issue of ultra vires. In order to tender an issue reaching the validity of the general plan, the complaint must allege facts showing the permitted use implicates a defective policy or standard in the general plan. Where it does, a challenge to the general plan may be raised in the administrative proceedings at which the conditional use permit is considered. (See *Woods, supra,* 28 Cal.3d at p. 676.)

We note that a challenge to an administrative act alleging the *present* inadequacy of a general plan must be meshed with the provisions of section 65750 et seq., which became effective after this case arose. (Stats. 1982, ch. 27.)[9]

◾ Here, Neighborhood claims Teichert's use permit implicates a defect in the noise element of the county's general plan. It is alleged (and the EIR shows)[10] the noise impacts of Teichert's activities were a specific focus of

---

[9]Section 65751 provides: "Any action to challenge a general plan or any element thereof on the grounds that such plan or element does not conform to the requirements of Article 5 (commencing with Section 65300) shall be brought pursuant to Section 1085 of the Code of Civil Procedure." Unlike the provisions of section 65680, section 65751 applies to "[a]ny action to challenge a general plan" as not in conformity with state standards. Accordingly, it provides an exclusive remedy by which to challenge such an infirmity whenever it is put in issue. This introduces some complexity into the remedial means by which this requirement is to be meshed with the challenge to the sufficiency of a permit predicated upon a defect in the general plan. The administrative body cannot be compelled to consider the defect in the administrative proceeding because the exclusive remedy lies in the ordinary mandamus proceeding. Consequently, there is no administrative remedy to be exhausted. (See *Woods* v. *Superior Court, supra,* 28 Cal.3d at pp. 680-681.) Thus, whenever the denial or invalidation of a conditional use permit is sought on numerous grounds, some of which must be raised in the administrative proceeding and some of which must be pursued by ordinary mandamus (as in cases like this one which arise *after* the effective date of § 65751), the protesting parties will have to fashion a combination of remedies in administrative mandamus, ordinary mandamus and injunctive relief. This cumbersome procedure is a consequence of the rigidities introduced by section 65751.

[10]The EIR for the project was filed with the administrative record. The EIR incorporates the draft EIR as a base and contains modifications and supplements which were appended in the review process. The draft EIR specifically considered the increase in noise levels that would be occasioned by the project: "*Impact.* Implementation of the proposal will not significantly increase noise levels in the area. It will, however, increase the frequency of noise incidents. . . . [¶] Off-site noise will be generated by truck traffic traveling to and from the proposed project. Studies conducted in several states under the direction of the U.S. Environmental Protection Agency reflect that the mean sound level of heavy duty trucks measured at a point 50 feet from the center line of the roadway is 90 dba. [¶] Off-site truck traffic generated noise is not expected to constitute a significant hazard under current conditions. However, in that the proposed project is a long-term project, future planning for the Jenny Lind area should consider the truck routes and provide for adequate noise protection measures. Based on the mean sound level figure of 90 dba reflected above, a distance of some 500 feet would be required to meet Federal residential standards assuming no intervening noise barriers. Significant work has been done in the past several years to reduce truck generated noise. Most of this work centers around improved tire, engine, and muffler

concern in the administrative proceedings. The statutory criteria for the noise element have included, since 1972, a quantitative inventory of noise levels associated with transportation facilities and a statement of land use policies for avoidance of excessive noise. (See Stats. 1971, ch. 1803, p. 3900; Stats. 1975, ch. 1104, p. 2677.) General plan compliance with these criteria provides the measure for land-use planning decisions in which noise is a significant issue. A quantitative inventory of existing transportation noise impacts must be compared with that added by a particular project. The aggregate noise level must be measured against policy statements and

---

designs. [¶] The General Plan Noise Element prepared by the Central Sierra Planning Council does not specifically address agricultural lands. However, the subject area is becoming popular as a 'rural residential' area. [¶] The noise element proposes standards which would limit maximum sound levels in rural suburban residental [sic] area to 40 dB(A) from 10 p.m. to 2 a.m. and 45-50 dB(A) from 7 a.m. to 10 p.m. If residential development occurs along the haul routes described under the heading of traffic above these standards may become difficult or impractical to meet. [¶] No mitigating measures are proposed regarding off-site truck generated noise with respect to this project."

Various state agencies submitted comments on the draft EIR. One of the comment letters is from the California Department of Transportation. The letter observed, inter alia: "The Location Map, Figure 1 on page 2 does not show State Highway Routes 4 and 120. Highway 4 is 6 miles from Milton. [¶] The County should consider routing trucks on to Route 4 which is rural and unpopulated. Also it probably has a better structural section to stand the higher T.I.'s (10 yr. = 8.5, 20 yr. = 9.0). At least for part of the way. [¶] This Quarry operation may route heavy trucks on to State Route 26 from Jenny Lind Rd. This is through the Rancho Calaveras subdivision which is a rapidly developing residential community. The noise from these trucks accelerating from the stop sign will be intolerable to these residents. There is little room for sound walls, etc. [¶] Page 24 of the report suggests including all or part of the local access routes in the State Highway System. [¶] Accelerated deterioration of Route 26 can be expected due to greatly increased axle loadings and volume of hauling rigs. [¶] Increased traffic combined with existing alignment of Route 26 will probably lead to increase in accident rate, especially [sic] among the trucks."

The response to this comment letter in the EIR is: "It is acknowledged that increased truck traffic will accelerate road deterioration and add to truck related impacts. State Route 26 is currently used extensively by heavy trucks although Cal Trans traffic counts do not differentiate between various types of traffic. Traffic problems are discussed in greater detail in other sections of this report."

The referenced discussion of traffic problems notes the various possible alternative routes including use of Highway 4 instead of Highway 26. This adds approximately 6 miles to the 28 mile distance of the route actually selected. "Of these alternatives, number two [utilizing Highway 26] appears to be the most feasible from an environmental point of view. Although both alternates one and two are currently being extensively used for heavy truck traffic, the Calaveras County Department of Public Works indicates that the Jenny Lind Road route can best withstand heavy traffic. Limiting trucks to this route would also expose fewer local residents to noise and traffic congestion caused by trucks. [¶] Each of the other alternatives would require extensive new construction or reconstruction of existing routes. Construction of new roads into areas of relative inaccessibility would result in all of the environmental impacts associated with development of open space for intensive use. These include the encouragement of smaller lot sizes, loss of wildlife habitat, interruption of natural drainage patterns, the introduction of noise, etc. In short, the development of new haul routes could result in a greater number and intensity of environmental impacts than they would resolve."

The anticipated duration of the project is from 10 to 20 years.

standards required to be in the general plan. Here, for example, such a ,comparison would have a bearing on the route selection for the trucks hauling the detritus.

The relevance of Neighborhood's claim the Teichert use permit impacts the seismic safety and safety elements of the general plan is less evident. The claim the sand and gravel trucks will increase the road hazards to drivers of other vehicles has no manifest relation to these elements. If Neighborhood cannot tie the permit to these elements, regardless of their inconsistency with section 65502, the permit cannot be invalidated on this ground. This question was not addressed in the demurrer proceedings. Assuming Neighborhood's complaint is vulnerable for lack of specificity, it is improper to uphold the sustained general demurrer without leave to amend on this ground. (See 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 796 et seq.) Neighborhood's pleading of causes of action premised on noncompliance of the use permit with the general plan is facially proof against the general demurrer.

II

Nonetheless, a facially adequate pleading may fail if importation of facts via judicial notice renders it inadequate. (See Code Civ. Proc., § 430.30 subd. (a).) The county presented the trial court with extrinsic facts arguably susceptible to judicial notice in the demurrer proceedings, although without observance of the formality of a request for judicial notice. However, the contention that these facts are sufficient to uphold the sustaining of the demurrers is not meritorious.

In a memorandum of points and authorities to the trial court the county incorporated a letter from the State Director of Planning and Research.[11] The letter states the director approved the county's request for an extension of time for the preparation and adoption of the safety, seismic safety, scenic highways, and noise elements of the general plan pursuant to section 65302.6. It bears the date of August 13, 1981. On appeal the county and Teichert suggest we take cognizance of this letter. They argue the extension

---

[11]We will assume arguendo we can properly notice the director's letter as an official act of the executive department of the State of California. (cf. Evid. Code, §§ 452, subd. (c), 459, subd. (a); Cal. Const., art. VI, § 13.)

granted by the letter guts Neighborhood's conformity claim by curing any technical error, thereby rendering the issues moot. We are not persuaded.

The extension does not of necessity invalidate Neighborhood's claim. Defendants assume a grant by the director of an extension pursuant to section 65302.6 is impervious to judicial review. That is not the case. The statutory authority to grant extensions of time to comply is circumscribed by numerous conditions.[12] The act of extension itself may be ultra vires as in violation of these conditions. Alternately, if not void, its legal effect may not extend a broad enough fig leaf to cover an antecedent deficiency. (Compare *Resource Defense Fund, supra,* 133 Cal.App.3d at p. 813.) Neighborhood has had no fair opportunity to litigate these issues. The letter was not introduced in the demurrer proceedings for the purpose now pursued.

We imply no view on Neighborhood's potential for success in any counterattack on the effect of a post hoc extension. It suffices to note that triable issues relating to the effect of the director's letter exist. The letter cannot rescue the demurrers from error.

### DISPOSITION

It was error to sustain the general demurrers without leave to amend. Resolution of the remaining issues is premature. The judgment is reversed with the following directions. The order sustaining the general demurrers shall be vacated. The conformity causes of action shall proceed as though Neighborhood's complaint were newly filed, affording a fresh opportunity to defendants to test the pleading.

---

[12]For example, section 65302.6 does not provide unlimited opportunity for procrastination. Subdivision (a) permits a maximum one year extension upon proper application. Subdivision (f) provides this period may be extended once, but for no more than one year. Whether any extension may be granted when application is made more than two years after the date when legal compliance was mandatory is a question open to doubt.

The legislative scheme requires that an extension application must be made if necessary as the compliance deadline approaches. Each new statutory requirement for a general plan must be met within two years from the date it is effective. Here, the noise element under challenge may not have complied with the original statutory criteria which became effective in 1972 and mandatory in 1977. (See § 65302.2.)[13] If no timely application was made until after this period elapsed, the authority of the Director of Planning and Research to confer the boon of an extension is dubious.

[13]Moreover, extensions are predicated, inter alia, on compliance during the interim with existing general plan elements and "with the new elements or plan proposals being considered or studied." (§ 65302.6, subd. (c)(3).) On this record we cannot determine if the latter requirement would have provided a substantially different basis for review of Teichert's project than review for conformity with the existing general plan.

Sims, J., concurred.

Regan, Acting P. J., concurred in the result.