[Nos. E007409, E007969. Fourth Dist., Div. Two. Dec. 31, 1991.]

GERALD GARAT et al., Plaintiffs and Respondents, v.
CITY OF RIVERSIDE et al., Defendants and Appellants.

ARLINGTON HEIGHTS CITIZENS ASSOCIATION et al., Plaintiffs and
Respondents, v.
CITY OF RIVERSIDE et al., Defendants and Appellants.

[Opinion certified for partial publication.*]

*This opinion is certified for publication pursuant to rules 976(b) and 976.1 of the
California Rules of Court except as to part VII of this opinion, which section does not meet
the standards of publication set forth in the aforesaid rule 976(b).

**COUNSEL**

John Woodhead, City Attorney, Freilich, Stone, Leitner & Carlisle, Katherine E. Stone, Warren J. Abbot and Philip A. Seymour for Defendants and Appellants.

Shute, Mihaly & Weinberger, Mark I. Weinberger, Rachel B. Hooper, Daniel P. Selmi, D. Dwight Worden and Stephan C. Volker as Amici Curiae on behalf of Defendants and Appellants.

McCutchen, Doyle, Brown & Enersen, Daniel J. Curtin, Jr., M. Thomas Jacobson, Maria P. Rivera, Reid & Hellyer, Dan G. McKinney, Charles T. Schultz, Alexandra S. Ward, Scott A. Anger, James Longtin, Maroney & Brandt and Barry Brandt for Plaintiffs and Respondents.

**OPINION**

TIMLIN, J.—In general, the matter before us has arisen within the context of an ongoing municipal land-use planning dispute between, on the one

hand, the City of Riverside (a charter city under the authority of article XI, sections 3 and 5, of the California Constitution, with charter set forth at Statutes 1981, Appendix-Charters, pages 55-80), its City Council and various "controlled growth" special interest groups (hereinafter, unless otherwise specifically indicated, the City) and, on the other hand, various private citizens, other special interest groups and development consortiums (hereinafter, unless otherwise specifically indicated, Garat), all of whom, collectively and individually, oppose the City's enactment (by and through the use of the initiative process by the City's voters) and enforcement of the "controlled growth" land-use planning measures at issue in this case.[1] In particular, the City has brought this appeal before us following the trial court's decision below, in consolidated "invalidity proceedings," that the City's general plan is (and for some length of time has been) deficient as a matter of law and that, consequently, two land-use initiative "ordinances" adopted by the citizens of the City to bear, in one fashion or another, on the functional application of the City's general plan to the City's future growth and development (Measure R and Measure C) are invalid and unenforceable.[2] Of course, the City has also mounted an appellate challenge to the trial court's award of attorney fees to Garat. We will conclude that the trial court erred, both with respect to procedural issues and with respect to substantive issues, in determining that the City's general plan, as well as Measures R and C, are invalid, and we will reverse the trial court's orders to that effect. We will also conclude that the trial court erred in awarding attorney fees to Garat and will reverse the trial court in that regard as well.

---

[1]Insofar as the instant appeals are concerned, the "Garat" case (Super. Ct. No. 191567) and the "Arlington Heights" case (Super. Ct. No. 192556, originally filed in the court below as Super. Ct. No. 191521) were consolidated by the trial court for all relevant purposes. Appellate case No. E007409 concerns the appeal taken from the orders entered below by the trial court on the primary, substantive matters at issue in this dispute. Appellate case No. E007969 concerns the appeal taken from the trial court's subsequent order determining that counsel for the plaintiffs/petitioners (respondents, here) were entitled to an award of attorney fees under the "private attorney general" theory (Code Civ. Proc., § 1021.5). These two appeals were ordered consolidated by this court, under appellate case No. E007409, for purposes of briefing, argument and resolution.

[2]By "invalidity proceedings," we do not mean actions brought pursuant to section 860 et seq., of the Code of Civil Procedure. Rather, we use the phrase "invalidity proceedings" to refer in a shorthand manner to the judicial proceedings conducted by the trial court in dealing with the various causes of action asserted by Garat to contest the validity of the City's general plan and/or the validity of Measures R and C (hereinafter referred to as invalidity causes of action). The distinction to be drawn is between, on the one hand, the invalidity causes of action asserted by Garat (seeking only the invalidation of the general plan and/or Measures R and C) and, on the other hand, the damages/just compensation causes of action asserted by Garat (seeking monetary recompense for the regulatory land-use "taking or damaging" effected by the adoption of Measures R and C). The precise nature and procedural posture of the various "invalidity proceedings" (and, indeed, of the various "invalidity causes of action" themselves) is a matter upon which we focus at length in part IA of this opinion.

FACTS

In 1969, the City formally adopted a general plan—a comprehensive and long-term amalgam of policies, goals, standards, guidelines and maps designed to form a cohesive and integrated framework within which to plan for the future physical development of the City (Gov. Code, §§ 65300-65302)[3] —in accordance with the requirements of chapter 3 ("Local Planning," beginning with § 65100), division 1 ("Planning and Zoning," beginning with § 65000), title 7 ("Planning and Land Use," beginning with § 65000) of the Government Code. The City's general plan was revised extensively on two different occasions during the early 1970's and has been amended in one particular or another on several occasions since then.

The voters of the City adopted a zoning ordinance, Measure R, in November 1979. In large part, Measure R served to apply an RA (residential agricultural) zoning classification to various portions of the City's territory and an RC (residential conservation) zoning classification to other portions of that territory—all with an eye to controlling the growth of development in areas of an "open" or "rural" character. The City thereafter amended its general plan so as to encompass the requirements of Measure R.

In November 1987, the voters of the City adopted further land-use and development legislation by initiative by adopting a Measure C. Measure C had a variety of functions, among them: (a) Amending Measure R so as to delete the authority of the City's council to amend or repeal Measure R; (b) amending Measure R so as to further promote and encourage agriculture by "protecting" agricultural lands from "premature" development (quotations, ours); and (c) requiring the City to develop a general plan for those areas within the City's sphere of influence that had not already been encompassed by the City's extant general plan.[4]

On January 28, 1988, the Arlington Heights consortium (referring collectively to the plaintiffs/petitioners in Super. Ct. No. 192556) filed the first of the two consolidated lawsuits which form the body of the dispute now before us. Arlington Height's suit set forth several different causes of action, some of which were attended (at least implicitly) by a prayer for monetary

---

[3]Unless otherwise indicated, all statutory citations refer to the Government Code.

[4]The City and Garat are in pronounced disagreement as to: (1) Whether Measure C is a zoning ordinance or an amendment to the City's general plan; and (2) whether Measure C merely amended Measure R or, in fact, completely readopted Measure R. As will be addressed in greater detail in the discussion which follows in the main text of this opinion, we need not fully resolve these disagreements in order to dispose of the appeal before us. It suffices for our purposes at this point to merely indicate, in very general terms, that Measure C "amended" Measure R.

damages/just compensation and some of which were attended by a prayer for extraordinary writ relief and equitable relief (including injunctive relief), all with the common theme that they challenged the validity of Measure C in one fashion or another. Included among these causes of action was a petition for a writ of traditional mandate directing the City "to void the initiative Measure C and Measure R (incorporated within the provisions of Measure C)" and "to forthwith cease administering and enforcing said initiative ordinances, or any part thereof." The Arlington Heights lawsuit was followed by the filing of a lawsuit by the Garat consortium (referring collectively to the plaintiffs/petitioners in Super. Ct. No. 191567) on February 1, 1988. As amended in March 1988, the Garat lawsuit was similar to the Arlington Heights lawsuit—in particular, to the extent that the Garat lawsuit contained a cause of action which petitioned the trial court for a writ of mandate directing the City "to cease administering or enforcing" Measure C. Some months thereafter, the trial court consolidated the Arlington Heights and Garat lawsuits and (in functional effect) bifurcated the damages/just compensation causes of action from the other causes of action (the "invalidity causes of action") so as to permit the invalidity issues to proceed to final resolution prior to resolving the remaining damages/just compensation issues.[5]

In very quick fashion, the invalidity proceedings became focused on the relatively narrow issues of whether the City's general plan was invalid and whether Measures R and C were themselves invalid because they were inconsistent with the (allegedly) invalid general plan. The next substantive step taken to bring the invalidity proceedings to a final resolution was taken by the City. In January 1989, the City filed a motion for summary judgment/summary adjudication of issues (summary adjudication). In this motion, the City argued, among other things: (1) That any challenge to the validity of

---

[5]In particular, the trial court's order was worded (in pertinent part) as follows:

"Under Section 1048(a)C.C.P. the Court will order Cases No. 192556 and 191567 consolidated for the purpose of Law and Motion matters, discovery and trial subject to the following terms and conditions:

"1. The pleadings, verdicts, if any, statement of decision and judgments shall be kept separate so that each action remains distinct in form and disposition.

"2. As to paragraph 48 of the fourth cause of action (Violation of Due Process) and paragraph 50 of the fifth cause of action (Violation of Equal Protection of the Laws by Discriminatory Effect) in Case No. 192556 and the tenth cause of action (Inverse Condemnation), eleventh cause of action (Violation of Due Process) and twelfth cause of action (discriminatory Legislation—Violation of Equal Protection of the Law) in Case No. 191567 the issue of deprivation of property rights, taking and/or damaging of property shall be bifurcated for discovery and trial.

"As to the tenth, eleventh and twelfth causes of action in 191567 discovery and trial shall be bifurcated regarding the issues of proximate causation and amount of damages and/or just compensation. Such discovery and trial shall commence after final determination of all other issues raised by the pleadings."

Measure R was time-barred; (2) that any challenge to the validity of the general plan was time-barred; (3) that the statutory requirement of consistency between zoning ordinances and their underlying general plans (§ 65860) was not applicable to charter cities; and (4) that, even if the City's general plan was deficient as a matter of law, the invalidation of Measures R and C was an inappropriate remedy by which to address such a deficiency. The City's motion presented the above issues (hereinafter, the summary adjudication issues) as being solely issues of law—issues of law which were without substantial controversy and as to which there were no triable issues of material fact.

■ The trial court denied the City's motion apparently (and curiously) on the ground, at least with respect to the above issues, that those issues were issues of law and not issues of fact.[6]

The trial court then conducted hearings on the substantive merits of at least some of the invalidity causes of action, first addressing the issue of the legal adequacy of the City's general plan. In June 1989, the trial court issued its minute order ruling on the legal adequacy of the City's general plan, to wit: "The Court finds that the general plan of the City of Riverside is legally inadequate in that its land use element, circulation element, housing element, and noise element do not substantially comply with the requirements of Government Code §65302. [¶] The Court finds that the said general plan is out of date, in that it fails to accurately reflect current conditions, and contains numerous internal inconsistencies." This minute order was followed by the filing of a statement of decision by the trial court which set forth a rather detailed discussion of the basis for the trial court's ruling.

The parties and the trial court then turned their attention to the issue of the appropriate remedy for the perceived shortcomings in the City's general plan. The trial court conducted further hearings with respect to that issue. Following these further hearings, the trial court concluded, and issued a statement of decision to the effect, that Measures R and C were required by law to be consistent with the City's general plan, that Measures R and C were enacted at a time when the City's general plan was internally inconsistent and otherwise deficient as a matter of law ("inadequate")—rendering consistency between the City's general plan and Measures R and C an

---

[6]Although the manner in which we have arrived at our disposition in this case does not require that we focus on this particular ruling by the trial court, we do note in passing that this basis for denying the City's motion seems directly contrary to the provisions of Code of Civil Procedure section 437c, subdivision (f), as that subsection was then worded—the statutory subsection that authorized the making of a motion for the summary adjudication of issues. Issues of law are properly resolved by way of a summary adjudication of issues. (See *Beech Aircraft Corp.* v. *Superior Court* (1976) 61 Cal.App.3d 501, 516-517 [132 Cal.Rptr. 541].)

impossibility—and that, consequently, the initiative measures themselves were invalid *ab initio*. The trial court thereafter entered two orders on the same day (Sept. 5, 1989), one of which was somewhat ambiguously denominated a "revised" order:

(1) The "first" order mandated the City to bring its general plan into conformity with the requirements of state law pursuant to the provisions set forth in article 14 ("Actions or Proceedings," beginning with § 65750), chapter 3, division 1, title 7 of the Government Code, and further mandated the City "to rescind Measures R and C, and to refrain from implementing those measures."

(2) The second, "revised" order deleted any reference to the City's obligation to bring its general plan into conformity with the requirements of state law, and instead simply declared Measures R and C to be "legally invalid" and mandated the City "to rescind Measures R and C, and to refrain from implementing those measures."

Following its rulings on the substantive issues raised by the parties, the trial court further ruled that Garat qualified for an award of attorney fees under the "private attorney general" provisions of section 1021.5 of the Code of Civil Procedure. The trial court did not fix the amount of attorney fees to be awarded, but made clear its intention that its decision as to the parties' "right" to such fees was to be treated as "final" for purposes of appeal, subject to a remand to the trial court for a fixing of the amount of the fees if the appropriateness of the award itself was upheld on appeal.

With respect to the substantive (i.e., invalidity) issues raised in the trial court below, the City has purported to appeal from four distinct trial court actions: (a) The trial court's statement of decision regarding its determination that the City's general plan was deficient as a matter of law; (b) the trial court's statement of decision regarding its determination that Measures R and C were legally invalid *ab initio*; (c) the trial court's order mandating the City to bring its general plan into conformity with the requirements of state law and to rescind and otherwise deny implementation to Measures R and C; and (d) the trial court's "revised" order simply mandating the City to rescind and otherwise deny implementation to Measures R and C. Of course, the City has also appealed from the trial court's collateral order awarding attorney fees to Garat, arguing that any such award of fees must "rise or fall" with the success of the underlying action and that the underlying action must, on appeal, "fall."

On appeal, among other issues, the City has once again raised the summary adjudication issues, the same legal issues which it first addressed to the

trial court in its motion for summary adjudication—the issue of the timeliness of the Garat and Arlington Heights actions, the issue of the (non)necessity of a charter city's zoning enactments being consistent with that city's general plan, and the issue of the appropriateness of invalidating Measures R and C to remedy the perceived deficiencies of the City's general plan.

As we discuss in detail below, we conclude that the trial court erred both in finding that the City's general plan was invalid/inadequate and in invalidating Measures R and C in light of that general plan's perceived invalidity/inadequacy. We also conclude that the trial court erred in awarding attorney fees to Garat.

Additional facts will be referred to, as needed, in the discussion which follows.

DISCUSSION

I.

APPEALABILITY ISSUES.

*A. Appealability of Trial Court's September 5, 1989, Orders.*

At the outset, we questioned whether the September 5, 1989, orders constituted an appealable "final judgment" over which this court could exercise appellate jurisdiction. (Code Civ. Proc., § 904.1, subd. (a); see *Supple* v. *City of Los Angeles* (1988) 201 Cal.App.3d 1004, 1009 [247 Cal.Rptr. 554].) We sought supplemental letter briefs from the parties on this question and received such a brief from the City of Riverside.[7] As we discuss below, we conclude that the trial court's September 5, 1989, orders *do* constitute an appealable "final judgment" within the meaning of section 904.1, subdivision (a), of the Code of Civil Procedure.

As a general matter (and leaving aside statutory exceptions), an appeal will not lie from other than a final and fully dispositive judgment by the court below—a judicial principle known as the "one final judgment rule": "Unless otherwise provided by statute, an appeal lies only from a judgment that terminates the proceeding in the lower court by completely disposing of the matter in controversy. [Citation.]" (*Henneberque* v. *City of Culver City* (1985) 172 Cal.App.3d 837, 841 [218 Cal.Rptr. 704].) As is the case with most general matters, however, the one final judgment rule admits

---

[7]We also inquired of the parties whether they would stipulate, were we to find that the orders brought before us on appeal did not constitute appealable orders, to the appeals being deemed by us to be original petitions for writs of mandate. All of the parties to these appeals so stipulated. Given our conclusion that the orders before us *are* appealable (see main text of opinion), we need not pursue the mandate characterization of these proceedings further.

of several exceptions. Of particular interest here is the exception recognized for "a judgment or order finally disposing of a cause of action that has been severed from separate and independent causes of action remaining to be tried." (*Day* v. *Papadakis* (1991) 231 Cal.App.3d 503, 508 [282 Cal.Rptr. 548], citing *Schonfeld* v. *City of Vallejo* (1975) 50 Cal.App.3d 401, 416-419 [123 Cal.Rptr. 669].) As emphasized in the *Day* opinion, this exception to the one final judgment rule requires *both* that there be an actual severance of the causes of action to be first tried from the causes of action to remain untried (with the severance occurring prior to the adjudication/disposition of those "first tried" causes of action) *and* that the first tried causes of action be substantively separate from and independent of the causes of action remaining to be tried. (*Day, supra,* 231 Cal.App.3d at pp. 510-511, citing *Armstrong Petroleum Corp.* v. *Superior Court* (1981) 114 Cal.App.3d 732, 736-737 [170 Cal.Rptr. 767], and approving *Armstrong*'s analysis of *Schonfeld, supra.*)[8]

■ The trial court's formal order severing the damages/just compensation causes of action from the invalidity causes of action does not create a problem with the "one final judgment rule" insofar as the present appeal is concerned. The damages/just compensation causes of action were clearly severed prior to their disposition and they concern issues which are indisputably separate and independent from those which are raised in the invalidity causes of action: (1) Most obviously, the damages/just compensation causes of action involve the calculation of monetary compensation, an issue completely absent from the invalidity causes of action; and (2) more fundamentally, the damages/just compensation causes of action assume the application of the land-use planning and zoning legislation here in issue and seek damages and/or just compensation for the application of that legislation to private property, while the invalidity causes of action assert that the land-use legislation here in issue either has been null and void from the outset or has become null and void—thus implicitly assuming that such legislation does not have any application to private property.

A far more troublesome matter insofar as the "one final judgment rule" is concerned is the fact that certain invalidity causes of action have been adjudicated in the trial court and brought before us in the instant appeal while *other* invalidity causes of action remain untried in the trial court.

---

[8] The *Day* opinion goes to some length to criticize recent opinions which suggest that the mere fact of severance alone is sufficient to create an exception to the one final judgment rule. (231 Cal.App.3d at pp. 511-512, criticizing *Highland Development Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 169 [215 Cal.Rptr. 881] and *Bank of the Orient* v. *Town of Tiburon* (1990) 220 Cal.App.3d 992 [269 Cal.Rptr. 690].) We agree with *Day* that the better rule, the rule that best serves the jurisdictional underpinnings of the one final judgment rule, is that which recognizes a "severance exception to the one final judgment rule" only in those instances where there is both an actual severance of causes of action and a showing of separation and independence between the causes of action to be tried first and the causes of action to be tried at a later time.

The issues which are presently before us on appeal are those which are concerned with (a) a determination of whether the City's general plan is valid and (b) if it is determined that the City's general plan is *invalid*, a determination of whether Measures R and C are invalid *as a consequence* of the general plan's invalidity. These issues are addressed in the first and second causes of action in the Arlington Heights lawsuit and in the fourth and fifth causes of action in the Garat lawsuit. Remaining untried in the trial court at this time are at least eight invalidity causes of action in the Arlington Heights lawsuit and seven invalidity causes of action in the Garat lawsuit— all of which appear to be concerned with the (in)validity of Measure C and/or Measure R, on one basis or another, but none of which appear to be concerned with the (in)validity of the City's general plan.[9] As far as we are able to determine from the appellate record, the trial court never formally severed the invalidity causes of action which were tried from those which

[9]Remaining untried at this time in the Arlington Heights lawsuit are the following invalidity causes of action: (1) The third cause of action (Measures C and R are invalid because they unlawfully hinder the City in fulfilling its legal obligation to meet regional housing needs); (2) the sixth cause of action (Measure C is invalid because it violates the constitutional principle of equal protection of the laws in that it favors owner-agriculturalists over other agriculturalists); (3) the seventh cause of action (Measure C is invalid because it unlawfully interferes with the City's ability to carry out its administrative fiscal duties); (4) the eighth cause of action (Measure C is invalid because its adoption violated the proscription against the adoption of administrative regulations (as opposed to legislative measures) by the initiative process); (5) the ninth cause of action (Measures C and R are invalid because they are so vague, ambiguous and speculative as to be unenforceable); (6) the tenth cause of action (Measures C and R are invalid because they violate California's comprehensive scheme of land-use regulation); (7) the eleventh cause of action (Measures C and R are invalid because they violate state laws regulating annexation and prezoning matters and also violate certain constitutional due process rights of some owners of adjacent but noncity property); and (8) the twelfth cause of action (seeking declaratory relief as to all previously pled causes of action). Although *portions* of Arlington Heights' fourth and fifth causes of action were formally severed on the basis of their raising damages/just compensation issues, it is arguable that certain portions of those two causes of action also remain untried at this time as to invalidity issues: Arlington Heights' fourth cause of action assails Measures C and R on the ground that they are so arbitrary and capricious as to violate the constitutional principle of due process; and Arlington Heights' fifth cause of action assails Measures C and R on the ground that they apply to property interests in such a discriminatory fashion as to violate the constitutional principle of equal protection of the laws.

Remaining untried at this time in the Garat lawsuit are the following invalidity causes of action: (1) The first cause of action (Measure C is invalid because it violates state laws regulating annexation and prezoning matters); (2) the second cause of action (Measure C is invalid because it violates state law defining the concept of "vested rights"); (3) the third cause of action (Measure C is invalid because its adoption violated the proscription against the adoption of administrative regulations (as opposed to legislative measures) by the initiative process); (4) the sixth cause of action (Measure C is invalid because it unlawfully hinders the City in fulfilling its legal obligation to meet regional housing needs); (5) the seventh cause of action (Measure C is invalid because it unlawfully interferes with the City's ability to carry out its administrative fiscal duties); (6) the eighth cause of action (Measure C is invalid because it violated the "single subject rule" relevant to the adoption of initiative measures); and (7) the ninth cause of action (Measure C is invalid because that portion of the

were not. Complicating matters further is the fact that the trial court's original order of September 5, 1989, addressed both the perceived invalidity of the City's general plan *and* the perceived invalidity of Measures C and R, while the trial court's "revised" order of September 5, 1989, addressed *only* the perceived invalidity of the two measures. This state of affairs is susceptible of two equally plausible interpretations:

(1) ██ Those invalidity causes of action which solely involve the issue of the (in)validity of the City's general plan were de facto severed from those invalidity causes of action which do not involve the issue of the (in)validity of the City's general plan.[10] The fact that the trial court tried *only* those invalidity causes of action involving the issue of the (in)validity of the City's general plan lends support to this interpretation; *or*

(2) The invalidity causes of action which involve the issue of the (in)validity of the City's general plan were not severed from those invalidity causes of action which do not involve that issue. The following facts *all* lend support to this interpretation: (i) the trial court did not issue a formal severance order; (ii) the causes of action which were tried and adjudicated by the trial court concerned the (in)validity of Measures R and C as well as the (in)validity of the City's general plan; and (iii) the trial court issued two separate final orders, one of which was concerned *solely* with the (in)validity of Measures R and C.

The record before us is simply too vague, ambiguous and incomplete to permit us to determine which of the above interpretations is the correct one. However, insofar as the instant appeal is concerned, *either* interpretation will support our exercise of appellate jurisdiction:

(a) *If* a de facto severance of the causes of action before us on appeal occurred, that severance constitutes a valid "severance exception to the one final judgment rule." There was an actual (albeit, de facto) severance and the severed, adjudicated causes of action involve an issue which is separate and independent of the issues raised in the other invalidity causes of action—the issue of the (in)validity of the City's general plan; *or*

(b) ██ *If,* on the other hand, there was not a de facto severance of the causes of action before us on appeal, the plaintiffs/petitioners are barred by the principle of res judicata from trying the remaining

---

election ballot by which it was presented to the electorate for adoption contained a misleading title and a misleading ballot summary).

[10]A de facto severance has been recognized as an appropriate "type" of severance for purposes of the "one final judgment rule." (*Highland Development Co.* v. *City of Los Angeles*, *supra*, 170 Cal.App.3d at p. 179.)

invalidity causes of action and the matter before us constitutes "one final judgment" insofar as the invalidity causes of action are concerned.[11]

We are not barred by the "one final judgment rule" from exercising appellate jurisdiction in the matter before us.

### B. Issues Properly Encompassed by the Notice of Appeal.

■ Garat has questioned the City's right to raise again on appeal the summary adjudication issues (*ante*). Garat argues that those issues are not encompassed by the limited and narrowly focused notice of appeal filed by the City in our case No. E007409. Garat is in error.

First, Garat argues that the summary adjudication issues cannot be raised on appeal by virtue of the City's purported appeal from the trial court's statements of decision. It is true, of course, and the City does not deny, that statements of decision are simply not appealable. (Code Civ. Proc., § 904.1.) To the extent, then, that the City has attempted to appeal from statements of decision by the trial court, the City's notice of appeal is of no effect. In response to this "overinclusiveness," the City has argued that the fact that a notice of appeal contains more than it should ought not to invalidate those portions of the notice that are appropriately set forth. In keeping with the general rule that notices of appeal will be liberally construed to provide for a hearing on the merits of those issues presented for appellate review (*Futlick* v. *F.W. Woolworth Co.* (1957) 149 Cal.App.2d 296, 298 [308 P.2d 405]), we agree with the City's position that its ineffective attempt to appeal from the trial court's statements of decision does not preclude it from bringing the summary adjudication issues before this court for review so long as those issues are implicated in properly appealable orders of the trial court which *are* addressed by the City's notice of appeal.

Second, Garat argues that an appeal from only a specified *portion* of a final judgment or appealable order is to be construed as bringing only those issues encompassed by the specified portion before the appellate tribunal for review (*Gonzales* v. *R.J. Novick Constr. Co.* (1978) 20 Cal.3d 798, 805 [144

---

[11]The principle of res judicata would apply in this "nonseverance" situation because the trial court clearly *did* decide, at least in the one context presented to it by the initial causes of action to be tried, that Measures C and R were invalid. If the plaintiffs/petitioners had wanted to establish that there were also *other* reasons for the invalidity of Measures C and R, as alleged in their other invalidity causes of action, it was incumbent on them to assert those other reasons (by also having their "other" invalidity causes of action tried and adjudicated) when the general issue of the (in)validity of Measures R and C was *first* tried: "To prevent piecemeal litigation, the doctrine of res judicata also applies to bar a second suit arising out of the same factual situation, involving matters which were relevant and within the scope of the first action, which thus *could* have been raised in the first suit. [Citation.]" (*Duffy* v. *City of Long Beach* (1988) 201 Cal.App.3d 1352, 1357-1358 [247 Cal.Rptr. 715], italics in original.)

Cal.Rptr. 408, 575 P.2d 1190]), and that this rule of limitation bars the City's attempt to raise the summary adjudication issues on appeal in this case. Garat reasons that the two trial court orders appealed from by the City (the order and "revised" order filed on Sept. 5, 1989) constitute only limited determinations by the trial court, that those orders do not encompass or implicate the summary adjudication issues, and that the City is thus precluded from raising those legal issues on appeal. The flaw in Garat's reasoning lies in its failure to recognize that the two orders appealed from by the City constitute the "final judgment" of the trial court insofar as the bifurcated invalidity proceedings brought before us are concerned. (See pt. IA, *ante.*) Indeed, by virtue of its orders, the trial court has determined that the City's general plan is deficient as a matter of law, that it must be brought into conformity with the requirements of state law, and that Measures R and C were void *ab initio* because they were, by virtue of their nature as "zoning enactments," required to be consistent with the general plan but were adopted at a time when the general plan was invalid and consistency was impossible to achieve—precisely the issues addressed by the City's motion for summary adjudication of issues. In our view, the City's appeal from the two orders of the trial court constitutes an appeal from *all* of the trial court's "final judgment" in the bifurcated invalidity proceedings conducted by that court, including all of the trial court's intermediate rulings relating to the issues which were finally adjudicated. The City's appeal constitutes a general appeal—and a general appeal presents for appellate review all of the material, nonappealable orders entered by the trial court in the proceedings below (Code Civ. Proc., § 906), such as a denial of a motion for summary adjudication.

Having determined that the City's summary adjudication issues are properly before us on appeal, we turn now to a substantive analysis of the trial court's decisions on all of the issues before us, including the summary adjudication issues.

## II.

### DO A CHARTER CITY'S LEGISLATIVE ZONING ENACTMENTS HAVE TO BE CONSISTENT WITH THE PROVISIONS OF ITS GENERAL PLAN?

In direct answer to the question, no—but a charter city may elect to be consistent.

As our discussion unfolds in this and the following sections, it will become clear that this issue, the issue of zoning/general plan consistency for charter cities, is the linchpin issue by which many of the other issues in this case are bound and fixed. It is, notwithstanding the considerable effort and attention paid to it by the parties, a relatively straightforward and simple issue.

■ The gist, the fundamental core, of Garat's attack on Measures R and C is the contention that Measures R and C are invalid because they are unlawfully inconsistent with the City's general plan and cannot be brought into lawful consistency with the general plan because the City's general plan is itself deficient as a matter of law—rendering "lawful" consistency an impossibility.[12] The inescapable flaw in this argument is the fact that the legislative zoning enactments (hereinafter, simply zoning enactments) of a charter city do not have to be consistent with that city's general plan. Thus, inconsistency between the zoning enactments of a charter city and that city's general plan does not invalidate those zoning enactments.

Section 65860, subdivision (a), provides in pertinent part: "County or city zoning ordinances shall be consistent with the general plan of the county or city by January 1, 1974." However, section 65803 has, from June 1986 to the present time, specifically provided: "Except as otherwise provided, this chapter shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city."[13] The "this chapter" referred to (at all times) in section 65803 is chapter 4 ("Zoning Regulations," beginning with § 65800), division 1, title 7 of the Government Code and is the chapter that contains section 65860.[14]

In this case, it is undisputed that the City is a charter city. A review of the City's charter reveals no adoption by the City of a consistency requirement in that document. The sole question remaining in determining whether the exemption provisions of section 65803 apply to the City, then, is whether the City has adopted a consistency requirement by way of ordinance. Garat argues that such is the case, and in support of its argument points to several provisions in the City's zoning laws that require that adjudicative/administrative approvals of applications for certain types of conditional use permits and minor variances be consistent with the City's "master plan." These scattered references to consistency, however, fall far short of section 65803's provision that a specific requirement of consistency between the zoning enactments and the general plan of a charter city will be found to exist only if that requirement is "adopted by charter or ordinance." On the face of the

[12]As a practical matter, Garat has, its protestations to the contrary notwithstanding, attacked Measures R and C.

[13]Prior to June 1986, section 65803 provided: "The provisions of this chapter shall not apply to a chartered city, except to the extent that the same may be adopted by charter or ordinance of the city." Insofar as our analysis of the issues before us in this case is concerned, the amendment of section 65803 in 1986 effected no substantive changes in the statute.

[14]Subdivision (d) of section 65860 is a statutory subdivision that provides a limited "exception to the exception" created by section 65803. This particular statutory subdivision serves to impose the consistency requirement of section 65803 on (as it turns out under the formulaic language of the subdivision) the City of Los Angeles. This "exception to the exception" has no bearing on this case.

City's extant charter/statutory scheme, then, there is no requirement that the City's zoning enactments be consistent with its general plan.

In passing, we note and reject two other arguments made by Garat in support of its contention that the City had, in fact, adopted a zoning enactment/general plan consistency requirement by ordinance:

(1) Garat argues that general purpose language contained in title 19 of the City's Municipal Code ("Zoning") constitutes the adoption of a zoning enactment/general plan consistency requirement by ordinance. It is true that section 19.02.020 of the City's Municipal Code contains the statement that the City's zoning regulations are deemed necessary to (among other things) "promote the public health, safety and general welfare, all as a part of the Master Plan of the City." This statement, however, is nothing more than a general statement of intention or purpose; it does not rise to the level of an express adoption of a zoning enactment/general plan consistency requirement as contemplated by section 65803.

(2) Garat also argues that the City's adoption of various "specific plans" —a specific plan being a more focused and detailed development "scheme" for a particular, limited portion of the greater area encompassed by the broader overall development "scheme" of a general plan—pursuant to article 8 ("Specific Plans," beginning with § 65450), chapter 3, division 1, title 7 of the Government Code means, by logical necessity, that the City has adopted a zoning enactment/general plan consistency requirement. The logic of Garat's argument unfolds in this way: (a) The City has adopted specific plans (e.g., the Sycamore Canyon Specific Plan) "in accord with California State requirements for specific plans (Government Code § 65450)"; (b) the adoption of specific plans is not subject to the general exemption from state zoning laws which is provided in section 65803 for charter cities; (c) specific plans must be consistent with their inclusive general plans (§ 65454); (d) no zoning enactments may be adopted or amended with respect to an area within a specific plan unless the zoning enactment would be consistent with the specific plan (§ 65455); (e) consequently, the City, by adopting specific plans in accordance with state law, has indirectly adopted an overall zoning enactment/general plan consistency requirement by ordinance. There are at least two flaws in this argument. First, assuming arguendo that the City has implicitly adopted a zoning enactment/general plan consistency requirement within certain specific plan areas, this simple fact does not compel the conclusion that the City has, as a general matter, adopted such a requirement for the entire general plan area. Second, and far more importantly, section 65700, subdivision (a), exempts charter cities from the provisions of chapter 3 ("Local Planning," beginning with § 65100), division 1, title 7 of the Government Code (excepting the requirement that a city adopt a general plan

containing all of the statutorily mandated plan elements) in virtually the same way that section 65803 exempts charter cities from the provisions of chapter 4 of that division and title—and the above provisions of the Government Code relating to specific plans are contained in that chapter 3. Thus, the City enjoys, even under this analysis, an exemption from consistency requirements unless the same are assumed "by charter or ordinance"—*not* "by remote implication."

In further argument on the same issue, Garat has attempted to circumvent the express exemption set forth in section 65803 by citing numerous cases which have found a consistency requirement in a myriad of factual contexts —all of them centering on the fundamental principle that a general plan is a "constitution for all future developments" (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 570 [276 Cal.Rptr. 410, 801 P.2d 1161], quoting from *O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774, 782 [42 Cal.Rptr. 283]) and recognizing that "the propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." (*Citizens of Goleta Valley* v. *Board of Supervisors, supra*, quoting from *Resource Defense Fund* v. *County of Santa Cruz* (1982) 133 Cal.App.3d 800, 806 [184 Cal.Rptr. 371].) *None* of the cases cited by Garat, however, have *held* that the zoning enactments of a charter city must be consistent with that city's general plan absent the city's having expressly adopted such a consistency requirement by charter or ordinance. That is, Garat has failed to cite one case which holds that a consistency requirement obtains in circumstances such as those that exist in *this* case.[15]

There is at least one case that addresses the consistency requirement in a context that is directly applicable to this case, *Verdugo Woodlands Homeowners etc. Assn.* v. *City of Glendale* (1986) 179 Cal.App.3d 696 [224 Cal.Rptr. 903]. In *Verdugo*, the court acknowledged the fact that the section 65803 exemption of charter cities from the consistency requirement of section 65860 arguably left charter cities virtually free to ignore the overall benefits of integrated planning. However, *Verdugo* also noted the fact that the Legislature has imposed the provisions of the state planning law on charter cities

---

[15] Of particular note, the opinion in *Mira Development Corp.* v. *City of San Diego* (1988) 205 Cal.App.3d 1201, at page 1214 [252 Cal.Rptr. 825], cited by Garat, does not hold that such a requirement exists. Rather, *Mira* simply holds that a zoning enactment, like any other legislative enactment, is subject to the requirement that it not be arbitrary or capricious (that is, that the enactment not constitute such an abuse of discretion as to amount to an abuse of the legislative body's fundamental police power) and that inconsistency between a zoning enactment and a general plan of a charter city might be one indicia of arbitrariness or capriciousness. This is very different from holding that the section 65803 exemption of charter cities itself has an implied exemption. Indeed, *Mira* expressly acknowledges the existence of the section 65803 exemption at the very page above cited.

in numerous instances (e.g., § 65300) and has steadfastly refused to do the same with respect to the consistency requirement. *Verdugo* reluctantly concluded, as do we, that the legislative directive of section 65803 is unmistakable and unavoidable and that the consistency requirement of section 65860 simply does not apply to charter cities which have not adopted the same for themselves by either charter or ordinance. We join with the strong suggestion made by our sister court in *Verdugo* (at p. 704) that the Legislature examine the wisdom of permitting charter cities (or their voters, through the initiative process) to ignore such a fundamental principle of sound land-use planning as consistency between a city's zoning enactments and that city's general plan for land use and development.

There seems to be no dispute that Measure R was a legislative act, enacted by way of the initiative process. We conclude that it constituted a zoning ordinance by applying RA and RC zoning classifications to certain property in Riverside. (See §§ 3 and 4 of Measure R.) The trial court erred in invalidating Measure R because of its perceived inconsistency with the City's general plan. To the extent that Measure C is a zoning enactment— and Measure C may be construed as zoning legislation insofar as section 4 of Measure C specifically amends section 7 of Measure R—the trial court erred in like fashion.[16] There is no requirement that there be any such consistency—irrespective of the validity of the City's general plan.[17]

---

[16]Even construed as a zoning enactment (due to its amendment of Measure R), however, Measure C still does not initiate or implement any substantive zoning functions such as the zoning of particular areas of land, creating zoning regulations or the classification of certain uses as falling within a given "type." Rather, Measure C's amendment of section 7 of Measure R merely established certain procedural changes in the way in which Measure R's provisions themselves were to be subject to change.

To the extent that Measure C is an amendment to the City's general plan, we deal with the trial court's rulings and orders in part V of this opinion. Noteworthy is the fact that most of the provisions of Measure C act neither as zoning legislation (establishing land use regulations and zones for particularly described areas, all in implementation of the general plan) nor as an amendment to the general plan regarding policies, objectives and goals for the physical development of the area addressed by the plan. Instead, most of the provisions of Measure C merely direct the City to take general action (and, in certain portions of the Measure, to take specific action) to implement Measure C and carry out the general plan. (See, in particular, § 5 of Measure C—adding subpar. 3(c), subsecs. (b) and (c)(6) to Measure R—as well as §§ 6, 7 and 8 of Measure C.)

There is a question regarding the legal validity of section 8 of Measure C insofar as it directs the City to adopt amendments to its zoning laws and its municipal code (see *Marblehead* v. *City of San Clemente* (1991) 226 Cal.App.3d 1504 [277 Cal.Rptr. 550]), but, given the nature of our analysis in this case, we need not address that question.

[17]Given our conclusion that the trial court erred in invalidating Measure R and Measure C (to the extent it is construed as a zoning enactment) on the ground that they were inconsistent with the City's general plan, we need not address the parties' arguments concerning the timeliness of the lawsuits insofar as that challenge relates to the attacks on the validity of the two initiative measures based on their inconsistency with the City's general plan.

## III.

### DOES THE GENERAL PLAN OF A CHARTER CITY HAVE TO BE INTERNALLY CONSISTENT IN ORDER TO BE VALID?

In direct answer to the question, yes.

In part II of this opinion, above, we addressed the issue of whether there is a statutory requirement of *external* consistency between a charter city's zoning enactments and its general plan. In this section of the opinion, we address whether there is a statutory requirement of *internal* consistency that applies to the general plans of charter cities.

This issue of internal consistency is one of the fundamental issues raised by Garat in its direct attack on the validity of the City's general plan and constitutes one of the primary grounds on which the trial court found the City's general plan to be invalid.

The statement of decision which the trial court referred to in its order finding the City's general plan deficient as a matter of law went on at great length to describe the shortcomings which the trial court found in that general plan. In large part, the trial court found that these shortcomings related to (what the trial court saw as) serious internal inconsistencies between the various parts, pieces and elements of the general plan. The trial court found that this internal inconsistency, as much or more than anything else, rendered the City's general plan invalid.[18] On appeal, the City contests the trial court's finding that its (the City's) general plan was invalid. ■ Among other things, and preliminarily, the City particularly challenges the trial court's determination that the general plan of a charter city must, by law, be internally consistent. We conclude that the trial court's determination in this regard was correct.

Here, unlike the consistency issue addressed in part II, above, we are dealing with provisions of the state planning law which *are* applicable to charter cities.

Insofar as it is pertinent here, section 65700, subdivision (a), has, at all times relevant to this matter, provided: "The provisions of this chapter

---

[18] The trial court also found that the City's general plan was invalid ("inadequate") due to (1) the "fact" that significant portions of it were so "out of date" as to be functionally useless as a foundational reference point for planning and development decisionmaking purposes and (2) the "fact" that the plan, as a physical document, was so "unavailable" to the public and to governmental personnel (owing to its lack of collection, collation, indexing and cross-referencing) that it was unusable as a "planning document." We address this aspect of the trial court's analysis in part V of this opinion, and conclude that neither "fact" is a sufficient basis for holding that the general plan is legally invalid/inadequate.

[chapter 3] shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city; except that charter cities shall adopt general plans in any case, . . . and such plans shall contain the mandatory elements required by Article 5 (commencing with Section 65300) of Chapter 3 of this title."

Since January 1, 1985, section 65300 has provided: "Each planning agency shall prepare and the legislative body of each county and city shall adopt a comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning. Chartered cities shall adopt general plans which contain the mandatory elements specified in Section 65302."[19]

Section 65300.5 (in effect and unamended since Jan. 1, 1976) provides: "In construing the provisions of this article [article 5], the Legislature intends that the general plan and elements and parts thereof comprise an integrated, *internally consistent* and compatible statement of policies for the adopting agency." (Italics added.)

The "chapter" referred to in section 65700, subdivision (a), is chapter 3, division 1, title 7 of the Government Code, the chapter which includes all of the above cited statutory provisions. The "Article 5" referred to in section 65700, subdivision (a), is the article of chapter 3 that contains sections 65300, 65300.5 and 65302.

The question thus presented is this: Do sections 65300 and 65700, subdivision (a), construed together and as they were worded at each and all time(s) relevant to this matter, require only that charter cities adopt a general plan that contains the enumerated "mandatory elements" of section 65302, *or* do sections 65300 and 65700, subdivision (a), as so construed, not only require that charter cities adopt a general plan that contains the enumerated "mandatory elements" of section 65302, but also require that charter cities adopt a general plan in which those "mandatory elements," *as construed under section 65300.5*, are internally consistent with each other? We conclude that the latter interpretation is the proper one. ■ We are guided in reaching this conclusion by the basic principle of statutory interpretation that

---

[19]The last sentence of section 65300, the sentence which contains the explicit reference to charter cities, was added to the section by the Statutes of 1984, effective January 1, 1985. Of course, section 65700, subdivision (a), at all times required that a charter city adopt a general plan—irrespective of section 65300's requirement to that effect.

A further note on section 65300: The section 65302 referred to in section 65300 is the statutory provision which sets forth the specific contents ("the mandatory elements") required in a general plan.

"wherever possible, a statute must be harmonized with other statutes contained in the legislative scheme." (*Verdugo Woodlands Homeowners etc. Assn.* v. *City of Glendale, supra,* 179 Cal.App.3d at p. 703.) ▆ In particular, we note:

(1) Section 65700, subdivision (a), requires that a charter city's general plan contain "the mandatory elements required by Article 5"—not just those mandatory elements required by section 65302. This broad-reaching language in section 65700, subdivision (a), leads us to conclude that the "mandatory elements" of section 65302 are to be understood and construed as being qualified by the other applicable provisions of article 5, such as the "internal consistency" provision of section 65300.5;[20]

(2) Section 65300.5, by itself, is a legislative directive as to how we are to understand and construe section 65302. Under the directive of section 65300.5, the "mandatory elements" of section 65302 must be understood as being "internally consistent mandatory elements."

The trial court did not err as a matter of law in reaching the issue of the internal (in)consistency between and among the mandatory elements of the City's general plan in determining whether that general plan was invalid.

## IV.

WAS THE CHALLENGE TO THE VALIDITY OF THE CITY'S GENERAL PLAN TIMELY?

In direct answer to the question, yes—but only with respect to those portions of the City's general plan which were potentially impacted or influenced by Measure C.

▆ In this section of our opinion, we address the issue of whether Garat's actions, insofar as they directly attacked the validity of the City's general plan itself rather than the validity of Measures R and C, were brought in a timely fashion.

▆ ▆ ▆ ▆ The City cites section 65009, subdivision (c), in support of its contention that the lawsuits filed in this case were, with the

---

[20] The fact that section 65300 merely requires charter cities to adopt general plans "which contain the mandatory elements specified in Section 65302," without reference to the broader requirements of article 5 referenced by section 65700, subdivision (a), does not compel a different conclusion on our part or suggest an inherent inconsistency between the two statutory provisions. Sections 65300 and 65700, subdivision (a), both require that the general plans of charter cities contain the "mandatory elements" set forth in section 65302—and section 65300.5 merely clarifies the manner in which the term "mandatory elements," as used in section 65302, is to be understood.

exception of the challenge to Measure C, untimely insofar as they sought to challenge the validity of the City's general plan itself.[21] That statutory subsection provides, in pertinent part: "[N]o action or proceeding shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within 120 days after the legislative body's decision: (1) To attack, review, set aside, void, or annul *the decision of a legislative body to adopt or amend a general or specific plan.* This paragraph does not apply where an action is brought based upon the complete absence of a general plan or a mandatory element thereof, *but does apply to an action attacking a general plan or mandatory element thereof on the basis that it is inadequate.*" (Italics added.)

■ The City focuses its argument on the second emphasized portion of the above statutory subdivision, arguing that the instant suits, insofar as they constitute an attack on the validity of the City's general plan itself, are clearly untimely inasmuch as they have been brought months, and even years, after the City's general plan was either adopted or amended (again, conceding the exception of the adoption of Measure C, understood as an amendment to the City's general plan).

Garat, on the other hand, focuses its argument relating to this issue on the first emphasized portion of the above statutory subdivision. Garat argues that the direct attack on the validity of the City's general plan is not an attack on a "decision of a legislative body to adopt or amend a general or specific plan," but, rather, is a direct attack on the extant substance of the general plan, the continuing (allegedly) inadequate condition of the general plan. Garat's position on this issue does not withstand close scrutiny.

---

[21]We are concerned here only with Measure C understood as an amendment to the City's general plan, not as a zoning enactment. As noted in footnote 17 of this opinion, we need not address the timeliness of the challenge to Measure C understood as a zoning enactment inasmuch as the trial court erred, in any event, in invalidating Measure C as a zoning enactment on the ground of inconsistency with the City's general plan.

Likewise, we need not address the "timeliness" argument raised by Garat that Measure R was "re-adopted" by Measure C and was, consequently, subject to a timely challenge by suit in precisely the same fashion as Measure C. Whether or not Measure R was "re-adopted" by Measure C, Measure R is a zoning enactment, not an amendment to a general plan, and the trial court erred in invalidating it on the ground that it was inconsistent with the City's general plan. In passing, and without reaching a specific holding on the matter, we note that relevant portions of section 9605 appear to defeat any argument that Measure C "re-adopted" Measure R: "Where a section or part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form. The portions which are not altered are to be considered as having been the law from the time when they were enacted; the new provisions are to be considered as having been enacted at the time of the amendment; and the omitted portions are to be considered as having been repealed at the time of the amendment." Initiative ordinances are, of course, subject to precisely the same rules of construction and interpretation as statutes. (*C-Y Development Co.* v. *City of Redlands* (1982) 137 Cal.App.3d 926, 929 [187 Cal.Rptr. 370].)

 Our determination as to whether section 65009, subdivision (c), should be applied to Garat's direct challenge to the validity of the City's general plan is directed by the Legislature's purpose in adopting that enactment: ". . . when the Legislature has stated the purpose of its enactment in unmistakable terms, we must apply the enactment in accordance with the legislative direction, and all other rules of construction must fall by the wayside." (*Milligan* v. *City of Laguna Beach* (1983) 34 Cal.3d 829, 831 [196 Cal.Rptr. 38, 670 P.2d 1121].) Here, the purpose underlying the Legislature's adoption of section 65009 is set forth unmistakably in subdivision (a)(3) thereof: "The purpose of this section is to provide certainty for property owners and local governments regarding decisions made pursuant to this division." The Legislature's clear call for a "quick and certain finality" as to the types of issues encompassed by section 65009 leads us to conclude:

(1) That Garat's direct attack on the validity of the City's general plan, inasmuch as it is an attack on "a general plan or mandatory element thereof on the basis that it is inadequate," *is* subject to the 120-day statute of limitations set forth in section 65009, subdivision (c); and

(2) That actions "attacking a general plan or mandatory element thereof on the basis that it is inadequate" must be brought in the context of an action "[t]o attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a general or specific plan."

We acknowledge that our interpretation of section 65009, subdivision (c), precludes the possibility of an action being brought to challenge the validity of a general plan on the ground of "inadequacy" in the absence of a "triggering event" such as the adoption or amendment of that plan.[22] However, we find that this limitation on actions challenging general plans is entirely consistent with the expressed legislative desire for finality and certainty set forth in section 65009, subdivision (a)(3).

We also acknowledge a further necessary implication of our interpretation of section 65009, subdivision (c): Inasmuch as an adoption of, or amendment to, a general plan is needed to "trigger" the 120-day "window of opportunity" within which challenges to the general plan based on inadequacy can be brought, it follows that only those portions of the general plan which are

---

[22]Section 65009, subdivision (c)(1), expressly exempts actions which are "based upon the complete absence of a general plan or a mandatory element thereof" from the 120-day statute of limitations. Presumably, section 65751 (which is concerned with "[a]ny action to challenge a general plan or any element thereof on the grounds that such plan or element does not substantially comply with the requirements of Article 5 (commencing with Section 65300)") would apply to an action based on such "complete absence."

impacted or influenced by the adoption or amendment can properly be challenged in the action which is brought. This requirement of some sort of nexus of relevancy between the direct object of the challenge (e.g., an amendment to a general plan) and the overall reach of the challenge (e.g., those portions of the general plan being amended or impacted by the amendment) is hardly startling and has been recognized in other contexts by other courts. (See, e.g., *Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1184 [203 Cal.Rptr. 401]; *Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 742 [270 Cal.Rptr. 650]: "The lack of a mandatory element invalidates the general plan if the missing element is directly involved in the project under review.")[23]

Garat's actions were filed within 120 days of the adoption of Measure C. To the extent, then, that Garat's actions seek to directly challenge the "adequacy" of the City's general plan, as amended by Measure C, Garat's actions are timely under section 65009, subdivision (c).

Having in these preceding four sections of the opinion resolved the various "procedural" issues raised by the parties on appeal, we now turn our attention to a substantive review of the trial court's determination that the City's general plan was deficient as a matter of law.

V.

WAS THE CITY'S GENERAL PLAN LEGALLY INADEQUATE?

*A. Scope of Review.*

As noted in part IV, only Garat's challenge to the "adequacy" of the City's general plan as amended by Measure C and as effective on November 3, 1987, is timely under section 65009, subdivision (c).

In addition, although, as noted in part II, Measure R was a zoning ordinance rather than an amendment to the general plan, and thus not subject to challenge under the "triggering event"/statute of limitations/nexus principles discussed in part IV, nonetheless, to the extent that Measure R was

---

[23]The precise extent to which Measure C as a general plan amendment relates factually to the various purported inadequate elements and provisions of the City's general plan, as amended by Measure C, is an issue which is addressed in part V of this opinion.

When we refer to "the general plan, as amended by Measure C" or to the specific provisions added to Measure R by Measure C (and, in particular, subparagraph 3(c), subsections (a) and (c)(1)-(c)(5) of Measure R) during our analysis of the "nexus of relevancy" requirement, we do not thereby assume the validity of Measure C.

amended by section 5 of Measure C,[24] and to the extent such amendment constituted an amendment, by Measure R, of the general plan (see fn. 19, *ante*), Garat's challenge to the "adequacy" of those portions of the City's general plan amended by Measure R, as Measure R was amended by Measure C, is also timely under section 65009, subdivision (c).

The issue on appeal is therefore whether the general plan, as amended by section 5 of Measure C in adding subsections (a) and (c)(1) through (5) to subparagraph 3(c) of Measure R, is adequate. ▮ The scope of review is limited by the requirement that there be a nexus between the amendments and the elements or characteristics of the plan claimed to be inadequate. If an amendment affects only a particular zoning category, we must first determine whether a general plan element or portions of the general plan claimed to be legally inadequate for whatever reason, including internal inconsistency, have any relevance as a planning guideline to that category; if not, we need make no determinations as to whether the element or other questioned portions of the general plan are themselves inadequate or inconsistent. (See, e.g., *Neighborhood Action Group* v. *County of Calaveras, supra,* 156 Cal.App.3d 1176, 1184.)

---

[24] Section 5 of Measure C added subparagraph 3(c) to Measure R. Subparagraph 3(c) provides in pertinent part:

"a. *Policy to Promote and Encourage Agriculture.* It is hereby declared to be the policy of the City of Riverside to promote and encourage agriculture as an essential industry and a desirable open space use. The Greenbelt and La Sierra Lands are important agricultural lands because of their high soil quality, favorable climate and low water costs. It is further declared to be the policy of the City to retain, wherever feasible, agricultural lands in private ownership and to encourage and assist the maintenance and formation of family farms, especially for farmers who live on their land. The City shall forthwith adopt such policies, ordinances, and resolutions as may be necessary to implement these policies.

" . . . . . . . . . . . . . . . . . . . . .

"c. *Additional Agricultural and Open Space Policies.* To further promote and preserve agricultural uses and agricultural lands in the City of Riverside, the City shall forthwith take any and all appropriate actions to carry out this measure, including but not limited to, the following:

"1. Insure that the Gage Canal water is reserved for agricultural use as the highest priority;

"2. Protect Greenbelt streets from heavy traffic;

"3. Minimize the extension of City services and urban infrastructure into agricultural land areas, except as needed for agricultural purposes;

"4. Develop and implement public service and infrastructure standards compatible with and appropriate for agricultural lands;

"5. Plan and implement programs wherever feasible in the Greenbelt, in the La Sierra Lands, in the Sycamore Canyon Park area and in other appropriate areas for recreational opportunities for biking, equestrian and hiking uses consistent with farming needs, agricultural and wildlife protection . . . ."

In our opinion, subsections (a) and (c) 1 through 5 of subparagraph 3(c), which set "statement[s] of development policies," "objectives, principles, standards and plan proposals," (§ 65302, introductory par.) are amendments to the general plan.

As to the contentions in this case, our review concerns whether subsections (a) and (c)(1) through (5) of subparagraph 3, subdivision (c) of Measure R (added by Measure C) and which encompass the following geographical areas, the "Greenbelt," "La Sierra Lands," Sycamore Canyon Park area, other appropriate areas of recreational opportunities for biking, equestrian and hiking uses consistent with farming needs, agricultural and wildlife protection, and lands described as "agricultural" in section 3, subdivision (c) of Measure C, relate to the alleged inadequate portions of the general plan.

It should also be noted, because there seems to have been some confusion below on this point, that the scope of review of the adequacy of the City's general plan is limited to a determination as to whether the plan was adequate *as of the time it was amended by Measure C on November 3, 1987*, and that we are not concerned with whether the general plan was adequate at any time before that. (*Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 545 [277 Cal.Rptr. 1, 802 P.2d 317]. See pt. IV, *ante.*)

*B. Standard of Review.*

■ General plan adequacy is reviewable under traditional mandate principles. (§ 65751.) On appeal, we conduct an independent review of the plan's adequacy; the question of whether there has been substantial compliance with the laws related to general plans is one of law, and therefore the conclusion of the trial court is not entitled to any deference. (*Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d 692, 742.)

■ On the other hand, the City's legislative enactments are entitled to some deference; there is a presumption that both the general plan and the initiative measures amending such are valid (see *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 604-605 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]), and so long as reasonable minds might differ as to the necessity or propriety of the enactment, the municipality's (or electorate's) determination of policy must be upheld. (*Ibid.*) The only issue to be resolved is whether, applying the standard that the legislation, unless clearly arbitrary, capricious, or entirely lacking in evidentiary support, must be upheld (*No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 243 [242 Cal.Rptr. 37]), the general plan, as amended, substantially complies with state law, i.e., whether there has been " '*actual* compliance in respect to the substance essential to every reasonable objective of the statute,' as distinguished from 'mere technical imperfections of

form.' [Citation.]" (*Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 348 [176 Cal.Rptr. 620], italics in original.)

In turn, as noted above, this issue is further narrowed by the principle that only insofar as the challenged legislation (here Measure C as a general plan amendment) is factually relevant to the alleged inadequacies of the plan will such inadequacies be reviewed to determine if the plan is adequate. (See *Neighborhood Action Group* v. *County of Calaveras*, *supra*, 156 Cal.App.3d 1176, 1187-1188.)

## C. Burden of Proof.

■ Because there is a presumption that the City's general plan and its initiative measure amending the plan are valid and that official duties have been regularly performed, the burden is on those challenging the plan (here Garat) to demonstrate that the plan is inadequate. (*Bownds* v. *City of Glendale* (1980) 113 Cal.App.3d 875, 883 [170 Cal.Rptr. 342].) It is also up to Garat to demonstrate the existence of a nexus between any plan inadequacies and the amendments thereto accomplished by Measure C. (See *Neighborhood Action Group* v. *County of Calaveras*, *supra*, 156 Cal.App.3d 1176, 1190.)

## D. The Meaning of Adequacy.

■ The term "adequate" has both a common and a legal meaning. The common meaning has overtones of subjectivity: synonyms include "acceptable," "appropriate," "satisfactory," and "suitable." In contrast, the legal meaning of "adequacy," as that term is used in connection with ascertaining the validity of general plans, is much more circumscribed: to be legally adequate, a plan must show "substantial compliance with the *statutory requirements*" for plans (*Camp* v. *Board of Supervisors*, *supra*, 123 Cal.App.3d 334, 348; *Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 297-298 [220 Cal.Rptr. 732]), and any judicial review must not become an impermissible study of the plan's merits. (175 Cal.App.3d at p. 298; *Camp*, *supra*, 123 Cal.App.3d at p. 348.)

Thus, the standards of adequacy are defined by the statutes related to general plans. Turning to those statutes, the following statutory requirements, for example, are necessary for an adequate general plan:

a. A general plan must be "comprehensive" and "long-term." (§ 65300.)

b. The plan and its elements and parts must comprise "an integrated, internally consistent and compatible statement of policies . . . ." (§ 65300.5)

c. The plan must address all the elements specified in section 65302, i.e., land use, circulation, housing, conservation, open space, noise, and safety. (§§ 65301, 65302.) The degree of specificity and level of detail shall reflect local conditions and circumstances. (§ 65301)

d. The required elements must meet the criteria, if any, set out in section 65302. For example, the components of the circulation element must be correlated with the land-use element. (§ 65302, subd. (b).)

It follows that even though a plan or its parts may not, from a court's subjective point of view, be "satisfactory" or "suitable," nonetheless, unless there is a statutory requirement on point, such unsatisfactoriness or unsuitability may not form a basis for concluding that the plan is legally inadequate.[25]

*E. The Trial Court's Conclusions as to Adequacy Under Statutory Requirements.*

In its statement of decision, the trial court concluded that the general plan was "legally inadequate" on the basis that:

(1) The land-use element did not contain required building intensity standards for nonresidential categories of land use,[26] citing section 65302, subdivision (a) and *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 699 [188 Cal.Rptr. 233];

(2) The housing element did not address housing objectives by income group as required by section 65583, and thus it failed substantially to comply with section 65580 et seq.;[27]

(3) The circulation element was not correlated with the land-use element as required by section 65302, subdivision (b), and this lack of correlation was not cured by the various community and specific plans;

(4) The noise element, adopted in 1975, had not been updated to reflect the data in the 1981 circulation and transportation element, thus creating

---

[25] When we refer to "legal inadequacy," included therein are allegations of internal inconsistencies within and between elements of the general plan. In other words, such inconsistency is an aspect of inadequacy, although we may discuss each condition separately.

[26] The trial court noted that the City's specific plans did not cure this defect because (a) the City failed to establish that the specific plans are part of the general plan, (b) all the specific plans do not contain legally adequate standards of building intensity, and (c) the specific plans cover only a small portion of the City's geographic area.

[27] The trial court noted, in a handwritten footnote to this finding, that on June 20, 1989, the City adopted an amendment to the housing element, but did not comment on whether this amendment cured the element's alleged inadequacy.

inconsistencies between the two elements, and the noise element also failed to provide noise analysis or contours for local industrial plants, "appears vague," and "does not include policies addressing noise compatibility to be used as a guide for establishing a pattern of land uses in the land use element that minimizes the exposure of community residents to excessive noise," all in violation of section 65302, subdivision (f)(5) and *Neighborhood Action Group* v. *County of Calaveras, supra,* 156 Cal.App.3d 1176, 1189;

(5) The general plan itself was not in compliance with the requirements of section 65300 et seq. "because it is out of date and fails to accurately reflect current conditions," apparently in violation of the plan's own general guidelines which provide that there should be major revisions every four or five years, and revisions as new information becomes available, as well as in violation of the principle set forth in *Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334, 351 that the status of the general plan as the "constitution" for the City's development mandates that the plan be reasonably complete and current;

(6) The general plan is internally inconsistent, in violation of sections 65300.5 and 65302, subdivision (b), in that the noise element is inconsistent with the circulation and transportation element, the floodplains shown in the open-space/conservation/scenic-highway elements and in the seismic/safety elements are inconsistent with each other, the circulation and transportation element is not correlated with the land-use element, and the land-use categories used in "various documents" are inconsistent; and

(7) The general plan is not available to the public, landowners, City staff and decision makers, and hence is not a usable planning document.

*F. The Trial Court Erroneously Relied Upon Two Nonstatutory Bases When It Concluded That the City's General Plan Was Legally Inadequate.*

 Before discussing the trial court's adequacy determination based on statutory requirements, we address its conclusion that the general plan was legally inadequate based, in part, on the fact that it had not been updated and the fact that in its current form, i.e., a collection of documents spread out over several locations, rather than a single, easily accessible document, it was not "available." Neither of these facts may form a basis for concluding that the plan is *legally* inadequate.

*1. With One Exception, There Is No Statutory Requirement That a General Plan Be Updated at Any Particular Time*

 Garat generally contends that overall the plan was out of date and specifically contends that the following elements were not based on current

data and were not meaningful planning tools: open space/conservation/ scenic highway, noise and seismic safety, and safety. It further asserts that in November 1987, the general plan was not long-term in perspective because it was adopted in 1969, its "horizon year" was 1990, and it had not been revised in a manner that assured its relevance to current conditions.

There is no statutory requirement that a general plan be updated at any given interval, or in connection with any given event, except that section 65588, made applicable to the housing element of general plans by section 65302, subdivision (c), provides that the housing element "shall" be reviewed as frequently as necessary to evaluate certain enumerated factors, and that, "[i]n order to facilitate effective review by the department [of Housing and Community Development] of housing elements, local governments . . . shall prepare and adopt the first two revisions of their housing elements no later than the dates specified in" the schedule set out in section 65588, with subsequent revisions to be completed at not less than five-year intervals following the second revisions.

It is a well-accepted principle of statutory interpretation that when " ' " " 'a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject [or the same subject] . . . is significant to show that a different intention existed.' " ' " (*Williams* v. *County of San Joaquin* (1990) 225 Cal.App.3d 1326, 1332-1333 [275 Cal.Rptr. 302], quoting *People* v. *Drake* (1977) 19 Cal.3d 749, 755 [139 Cal.Rptr. 720, 566 P.2d 622], quoting *People* v. *Valentine* (1946) 28 Cal.2d 121, 142 [169 P.2d 1], quoting 23 Cal.Jur. 778, § 154.) Thus, where, as here, the Legislature specifically directs that a particular portion of a general plan must be updated on a regularly scheduled basis, but fails to impose a similar requirement as to the plan itself, or any other element or part thereof, we conclude that there is no statutory requirement that anything other than the housing element be regularly revised.[28]

### 2. *There Is No Statutory Requirement That a General Plan Be Organized or Kept in Any Particular Format or Location*

There is no statutory requirement, within the Government Code provisions related to general plans, that a general plan be kept in such a

---

[28]This conclusion does not preclude a court from looking at the results of a public entity's failure to update its entire plan or any parts thereof, i.e., the failure to update a plan and/or its parts may cause a general plan or mandatory element to not be in compliance with the statutory requirements ("legally inadequate") which, in turn, if properly challenged in a timely manner, may subject the entity to an attack on its validity pursuant to those proceedings provided in section 65750 et seq.

format that it is "available to the public, landowners, city staff and decision makers." The only statutory language related to this issue is found in section 65301, subdivisions (a) and (b), which provide that the plan may be adopted "in any format deemed appropriate or convenient by the legislative body, including the combining of elements" and that the plan "may be adopted as a single document or as a group of documents relating to subjects or geographic segments of the planning area."

It is true that in *Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334, 349, footnote 8, the reviewing court agreed with those challenging the adequacy of the plan that the physical composition of the plan (which was apparently rather disorganized) made "resort to it an awkward exercise and would also seem to generate doubt concerning the integrity of the plan," but there was never even a suggestion, much less a holding, that such deficiencies could serve as the basis for invalidating the plan.

By our opinion on this matter, we do not intend to indicate approval of a general plan which is scattered among various governmental departments and for which there is no comprehensive index, or which is otherwise difficult to obtain in whole or in part. We merely hold that the ease of access to a plan (as opposed to whether it actually exists) is not a basis for attack under a mandate action brought pursuant to section 65751.[29]

*G. Garat Has Failed to Carry Its Burden of Proof as to the Required Nexus Between the General Plan Defects of Which It Complains and the Policies and Geographical Areas of Inquiry Implicated by the Measure C Amendments to the Plan.*

As noted above, it is Garat's burden to prove that the plan is legally inadequate. (See pt. VC.) The first step which must be taken to meet that burden is to demonstrate the existence of a nexus between the claimed inadequacies of the amended plan and the policies and geographic areas implicated by the amendment. As discussed below in connection with each of the four areas of claimed inadequacy of the elements of the City's general plan, Garat has failed to meet this initial step of its burden of proof.

*1. Garat Has Failed to Establish a Nexus Between the Asserted Legal Inadequacies of the Land-use, Housing, Circulation and Noise Elements and the Policies and Geographical Areas Implicated by the Measure C Amendments*

Garat contends that the Measure C amendments relate to the asserted legal "inadequacies" of the land-use, housing, circulation and noise

---

[29]This is not to say that there is no remedy for the citizen who wishes to use a city's or other entity's general plan, and who discovers that the documents comprising the plan cannot be found. (See § 6250 et seq., relating to the accessibility of public records.)

elements of the general plan, separate and apart from the alleged "inconsistencies" within and between various elements of the plan. However, without exception, it has failed to establish any nexus between these legal inadequacies and the policies and geographical areas implicated by the adoption of Measure C.

### a. The Land-use Element

Garat contends that the land-use element does not include standards of building intensity recommended for nonresidential categories of land use. In four and one-half pages of discussion about the legal requirement for such a standard, there is not a single word related to any nexus between the policies and geographical areas implicated by the adoption of Measure C and the lack of such standards.

### b. The Housing Element

Garat contends that the housing element fails to include quantified objectives for the provision of housing for all income levels. Again, Garat makes no attempt to argue that there is any nexus between the policies and geographical areas implicated by the adoption of Measure C and this asserted inadequacy.

### c. The Noise Element

Garat contends that the noise element fails to provide noise contours for local industrial plants, and also fails to include land-use policies to minimize the exposure of residents to excessive noise. Again, Garat makes no attempt to argue that there is any nexus between the policies and geographical areas implicated by the adoption of Measure C and this asserted inadequacy.

### d. The Circulation Element

Garat also contends that the circulation element fails to reflect changes in land use since 1981, so that the circulation and land-use elements are not correlated as required by section 65302, subdivision (b). Again, Garat makes no attempt to argue that there is any nexus between the policies and geographical areas implicated by the adoption of Measure C and this asserted inadequacy.

### H. Garat Has Failed to Establish a Nexus Between the Asserted Inconsistencies Within and Between the Various Elements and the Policies and Geographical Areas Implicated by the Adoption of Measure C.

Garat contends that certain asserted internal "inconsistencies" within the general plan and between certain elements of the plan, affect the policies and

geographical areas of Measure C. However, without exception, it has failed to establish any nexus between the policies and geographical areas implicated by the adoption of Measure C and these internal inconsistencies. It is not enough to simply point to asserted conflicts between two elements, as Garat has done here; instead, it is necessary to explain how the land-use policies established by Measure C for particular geographical areas described in Measure C will be affected by such inconsistencies.

For example, in *Sierra Club* v. *Board of Supervisors* (1981) 126 Cal.App.3d 698 [179 Cal.Rptr. 261], the Sierra Club brought an action challenging an ordinance which changed the zoning in an area from agricultural to residential uses based on inconsistency between the maps for two elements of the general plan. The Sierra Club demonstrated not only that the map of the land-use element was inconsistent in some areas with the map of the open space/conservation element, but that the particular property in question which had had its zoning changed as a result of the ordinance (here, what we have been referring to as the geographic areas implicated by Measure C policies), while zoned consistently with the map of the land-use element, was inconsistently zoned as to "the map of the open space conservation element *in the area where the [subject] property [was] located." (Id.* at p. 703, italics added.) In other words, the plaintiffs established that there was an actual connection between the inconsistent elements and the property in question.

## 1. *The Conflicting Floodplain Maps*

■ Garat complains that the floodplain map in the open space, conservation and scenic highways element conflicts with the floodplain map in the seismic safety and safety element of the general plan, because the maps were adopted at different times and designate different areas as subject to possible flooding.[30]

Garat makes no attempt to point to a connection between the alleged inconsistency between these two maps and the geographical areas implicated by the adoption of Measure C.

Furthermore, Garat makes no attempt to demonstrate that the difference in the maps is actually an inconsistency. A public entity might well decide, for purposes of planning for seismic safety and general safety, to use a map designating a different degree of flooding and broader land area subject to flooding than the degree and area of flooding considered relevant for open space, conservation and scenic highway planning.

---

[30] The map contained in the safety element shows a larger area subject to flooding than does the map contained in the open space element.

The fact that section 65302, subdivisions (a), (d), (e) (via § 65560) and (g) mandate or suggest that the land-use, conservation, open space and safety elements of a general plan *all* contain information on floodplains and/or flood control is an indication that the degree and risk of flooding may differ depending upon the planned uses to which the land may be put; therefore, the mere fact that the maps in the various elements do not match as to land area does not necessarily mean that there is a legally consequential "inconsistency."

The broad objectives of general plans may well be expected to encompass competing interests (see *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 175 [217 Cal.Rptr. 893]), and an informed resolution of the tension between such competing interests requires that the information related to each objective be provided with an eye towards defining the scope of the conflict, not towards providing information which has been homogenized so that the same subject, i.e., floodplains, is dealt with as a factor unconnected with the objectives related to the general plan element to which the subject relates. To put it another way, section 65300.5 requires that the general plan and its elements and parts "comprise an integrated, internally consistent and compatible statement of *policies* . . . ." It is the *policies* which must be integrated, internally consistent and compatible, not the maps which simply depict policies applied to specific land areas, not the data and statistics, and not even the objectives within the various elements.[31]

Obviously, of course, misinformation may make it impossible for the public entity to set up and implement policies in a consistent manner, but on this issue, too, a person challenging the adequacy of a general plan must point out the nexus between the inconsistent information and the public entity's asserted inability to set up or implement consistent policies.

---

[31]For example, in *Concerned Citizens of Calaveras County* v. *Board of Supervisors* (1985) 166 Cal.App.3d 90 [212 Cal.Rptr. 273], the circulation element stated that existing county roads would accommodate projected traffic during the life of the plan, but that problems would surface in the future as homes and businesses were built. The circulation element failed to make any proposals for dealing with such problems other than to ask higher levels of government for more money. On the other hand, the land-use element projected substantial population increases, without noting that state highways might be inadequate to handle the growth, and did not contain any objective, standard or proposal for restricting unlimited growth if the highways became inadequate.

It is apparent that what made these elements legally objectionable as being internally inconsistent and insufficiently correlated with each other was not the discrete pieces of information they contained, i.e., that the roads were adequate, or that there would be substantial population increases, or that problems would surface with the roads as homes and businesses were built, but was instead the failure of the county to adopt objectives, standards or proposals as part of a consistent policy to make sure that population growth did not overwhelm the existing circulation infrastructure, and that the circulation infrastructure would be increased to keep up with population growth.

### 2. *The Lack of Correlation Between the Circulation and Transportation Element and the Land-use Element*

 Garat contends that the circulation and transportation element is not sufficiently correlated and consistent with the land-use element because the land-use plan diagram has been continually revised since 1981 to reflect changes in land-use designations for "particular areas within the City," and additional community and specific plans have been adopted, but the circulation element, which was adopted in 1981, has not been revised to reflect these changes in land-use designations.

Once again, Garat makes absolutely no attempt to point to a connection between the alleged inconsistency and lack of correlation between these two elements and the geographical areas and policies established by the adoption of Measure C. Furthermore, Garat makes no attempt to demonstrate that the various changes in land use and adoption of community and specific plans *actually* have resulted in an impact on traffic and other circulation and transportation concerns, or whether such impact, if any, was such as to require the circulation element to be updated so as to avoid inconsistency or lack of correlation with the land-use element. Although the normal nature of growth in Southern California might suggest that such would be the case, such a suggestion hardly takes the place of actual evidence sufficient to satisfy Garat's burden of persuasion, let alone of proof.

### 3. *Inconsistent and Incompatible Land-use Designations in the General Plan*

 Garat next urges that the land-use categories used in various plan documents are inconsistent and incompatible, giving as an example the fact that the land-use plan diagram lists, under the title of "Open Space/Parks," three categories: (1) public park, (2) natural arroyo, and (3) local park (with several subcategories of parks), whereas the general plan text describes separate categories denominated as "open space" (which includes steep slopes and washes), "urban parks" (with several subcategories), "golf courses" and "gateway parks." According to Garat, these inconsistencies make it impossible to determine with certainty what the permitted uses are for property within the City, so that "[t]hus, a basic function of the General Plan, i.e., to guide future land uses, goes unfulfilled."

To repeat, Garat fails to correlate the inconsistencies claimed to exist because of these differing denominations with any policies and geographical areas implicated by the adoption of Measure C and also fails to establish that the differing denominations actually create any legally cognizable inconsistency. For example, it has failed to show that any particular piece of land,

much less the geographical areas designated in Measure C, could not be used as either or both a gateway park pursuant to the categories in the plan's general text and as a public or local park pursuant to the categories in the land-use element. The mere use of different names for certain categories of use does not prove that the uses are inconsistent or mutually exclusive; "What's in a name? That which we call a rose/ By any other name would smell as sweet." (Shakespeare, Romeo and Juliet, act II, scene 2, line 43.)

### 4. *The Inconsistency Between the Circulation and Transportation Element and the Noise Element*

 Garat's final contention as to the plan's internal inconsistencies is that the noise element, because it is based on substantially different factual assumptions regarding the City's existing and projected circulation system than is the circulation element, is "fundamentally inconsistent" with the circulation element. Once again, Garat fails to establish either a nexus between the alleged inconsistency and the policies and geographical areas provided by the adoption of Measure C *or* any evidence that the changes in the circulation element actually created a need to update the noise element to avoid the kind of factual inconsistencies which would in turn result in inconsistent *policies.*

Because Garat has failed to establish the requisite nexus between the policies and geographical areas implicated by the Measure C amendment and the claimed inadequacies of the plan as amended by Measure C, we need not consider whether the asserted inadequacies actually exist.

### VI.

### WAS INVALIDATION OF MEASURES R AND C A PROPER REMEDY FOR THE (PERCEIVED) INVALIDITY OF THE CITY'S GENERAL PLAN?[32]

In direct answer to the question: No, under the circumstances of this case. (See fn. 32, *ante.*)

---

[32]In this section of the opinion, we address a somewhat different issue than that which was addressed in part II of our opinion, above. In part II of our opinion, we discussed the appropriateness *vel non* of concluding that Measures R and C were invalid *ab initio* on the ground of their (alleged) inconsistency with the City's general plan—that is, we discussed the invalidity of Measures R and C in the context of Garat's direct legal attack on the two initiative measures. In this section of the opinion, we turn our attention to the appropriateness *vel non* of the trial court's invalidation of Measures R and C to *remedy* the (alleged) invalidity of the City's general plan—that is, we here discuss the invalidation of Measures R and C in the context of Garat's direct attack on the City's general plan itself.

Given the fact that we have already concluded that the City's general plan is *not* legally invalid/inadequate insofar as the challenges brought in this case are concerned (see pt. V, *ante*), we must, and do, acknowledge that the discussion in this section of the opinion is dictum. However, we nevertheless address the question because we are mindful that (1)

 The Legislature has provided an appropriate statutory remedy for a finding that a general plan is inadequate. That remedy is set forth in article 14 ("Actions or Proceedings," beginning with § 65750), chapter 3, division 1, title 7 of the Government Code. This article concerns itself with "[a]ny action to challenge a general plan or any element thereof on the grounds that such plan or element does not substantially comply with the requirements of Article 5 (commencing with Section 65300)." (§ 65751.) This article neatly "fits" with the actions brought here by Garat and Arlington Heights.

In particular, and only in part, article 14 provides:

(a) In section 65753, for an expedited hearing schedule for any suit brought pursuant to the provisions of article 14;

(b) In section 65754, that—if a trial court enters a favorable judgment for a plaintiff in an action of the sort addressed by article 14 and, in conjunction with that judgment, determines that a city's general plan "does not substantially comply with the requirements of Article 5 (commencing with Section 65300)" (i.e., "is inadequate")—the trial court shall mandate the city to bring its general plan into compliance with that article 5 within 120 days;[33] and

(c) In section 65755, an extensive enumeration of the various conditions, provisions and remedies—not including the invalidation of zoning enactments—by which a court can oversee the land-use planning processes of the governmental body in question while the general plan is being brought into conformity with the requirements of state law.

---

general plan (in)validity/(in)adequacy is an issue which is likely to appear regularly before the trial courts which are subject to the appellate review of this court and (2) the general issue of the proper remedies in this particular area of the law is one that is apt to present recurring problems for the trial courts. (*Sierra Club* v. *Board of Supervisors*, *supra*, 126 Cal.App.3d 698, 708.)

[33]It is interesting to note that subdivision (b) of this statutory section provides that noncharter (i.e., general law) cities must bring their noncomplying general plans into conformity with state law and then they must conform their zoning ordinances with the amended general plans. Implicit in this legislative scheme is an acknowledgment that the appropriate remedy for invalid general plans is not the invalidation of zoning enactments adopted with respect to such plans, but the mandate that the general plans be brought into conformity with state law, and then that the zoning enactments be brought into conformity with the (now conforming) general plans. There are at least two desirable goals of sound government served by this approach: (1) It better enables the courts to maintain an appropriate distance and disinvolvement from the legislative function of plan/ordinance adoption; and (2) it better enables the courts to refrain from making (perhaps unwarranted) assumptions as to what should be invalidated and what should not—it is conceivable, for instance, that once a general plan were amended so as to be brought into compliance with state law, it would be unnecessary to amend extant zoning enactments to come into conformity with that general plan. (See also, *Lesher Communications, Inc.* v. *City of Walnut Creek*, *supra*, 52 Cal.3d 531, 546, fn. 12.)

Garat argues that the Legislature has not declared the provisions of article 14 to be exclusive remedies by which to address a found inadequacy in a general plan. This, as far as it goes, is accurate. We are persuaded, however, that the extensive and integrated nature of the legislative scheme in article 14 evinces a legislative intent that the provisions of that article serve as the *primary* judicial remedy by which to address such shortcomings. We conclude that under the circumstances of this case, the scheme of judicial oversight set forth in article 14, and not judicial invalidation of Measures R and C or a blanket invalidation of the City's general plan, would have been the appropriate "mechanism" by which to remedy any perceived invalidity/inadequacy in the City's general plan.[34]

## VII.

### GARAT IS NOT ENTITLED TO ATTORNEY'S FEES PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1021.5*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The trial court's "Order" of September 5, 1989 (and, by reference, its minute order of June 10, 1989) finding and declaring the General Plan of the City of Riverside legally invalid is reversed.

The trial court's "Revised Order Regarding Validity of Initiative Measures" of September 5, 1989, finding and declaring Measures R and C legally invalid is reversed.

---

[34]Garat has also argued that our Supreme Court's decision in *Lesher Communications, Inc.* v. *City of Walnut Creek, supra*, 52 Cal.3d 531 supports the use of an "invalidation remedy" in cases such as this one. Garat's reliance on *Lesher* is misplaced. *Lesher* concerned a situation in which the validity of a zoning ordinance was challenged on the ground that the ordinance was void *ab initio* because it conflicted at the time of its adoption with a general law city's general plan; it did not concern a situation such as the one presented by this case—a situation in which the legal challenge is to the validity/adequacy of a general plan itself. In upholding the challenge to the ordinance there in question, our Supreme Court noted in *Lesher* that the invalidation of the offending zoning ordinance by the lower court actually would do nothing more than "carry out" that which had already been accomplished by operation of law: "The court does not invalidate the ordinance. It does no more than determine the existence of the conflict. It is the preemptive effect of the controlling state statute, the Planning and Zoning Law, which invalidates the ordinance." (*Id.*, at p. 544.) To invalidate (or, perhaps more accurately, to declare the invalidity of) a zoning ordinance because it was void *ab initio* is a far different matter than invalidating a zoning ordinance to *remedy* an invalid general plan.

*See footnote, *ante*, page 259.

The trial court's order of April 13, 1990, awarding attorney fees to the petitioners therein (Garat, herein) is reversed.

Ramirez, P. J., and McKinster, J., concurred.

The petition of all respondents for review by the Supreme Court was denied April 16, 1992.